**In re AETNA INC. SECURITIES LITIGATION.**

No. Civ.A. 1219.

United States District Court,
E.D. Pennsylvania.

Feb. 2, 1999.

and valued at $8.9 billion. Before the Court are two Motions to Dismiss Plaintiffs' Consolidated and Amended Class Action Complaint ("Amended Complaint"), one filed by Defendants Aetna, Ronald E. Compton ("Compton"), and Richard L. Huber ("Huber") and the other filed by Defendant Leonard Abramson ("Abramson").[1] For the reasons set forth below, the Court will grant in part and deny in part the Motion to Dismiss of Defendants Aetna, Compton, and Huber and will grant the Motion to Dismiss of Defendant Abramson.

## I. INTRODUCTION

The action is brought on behalf of (1) all persons who bought on the open market the common stock of Aetna between March 6, 1997 and 7:00 am (EDT) on September 29, 1997, inclusive ("the class period") and (2) two subclasses of persons who purchased Aetna common stock contemporaneously with the sales of such stock by Defendants Abramson and Compton. Plaintiffs' claims arise under Section 10(b), Section 20(a), and Section 20A(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C.A. §§ 78j(b), 78t(a), and 78t–1(a) (West 1997), and Rule 10b–5, promulgated thereunder, 17 C.F.R. § 240.10b–5 (1999).

The essence of Plaintiffs' case is that (1) Defendants falsely represented that Aetna was successfully integrating Aetna's operations with the operations of USHC following their merger and (2) Aetna issued false and misleading financial statements for the first and second quarters of 1997. In particular, Plaintiffs have alleged that after the merger of Aetna and USHC, the following problems associated with the integration of the operations of Aetna and USHC existed:

- Because the computer systems used by Aetna and USHC were incompatible, the conversion of Aetna's contracts and claims adjudication and reimbursement payment systems from its computer sys-

## MEMORANDUM

PADOVA, District Judge.

This case arises out of the acquisition by Aetna, Inc. ("Aetna") of U.S. Healthcare ("USHC") in a transaction first announced on April 1, 1996, consummated on July 19, 1996,

1. At the time of Aetna's acquisition of USHC, Compton was Aetna's Chairman and Chief Executive Officer ("CEO"), Huber was Aetna's Vice Chairman and Chief Financial Officer ("CFO"), and Abramson was Chairman and CEO of USHC. Under the terms of the merger, Compton remained the Chairman and CEO of Aetna and Abramson joined Aetna's Board of Directors, served on its Finance Committee, and acted as a consultant to Aetna. On July 25, 1997, following the resignation of Joseph T. Sebastianelli as President of Aetna, Huber became Aetna's President and CEO. Compton continued as Aetna's Chairman.

tems to USHC's more advanced system was plagued with difficulties (Am.Compl. at ¶¶ 54–56);

- In early 1997, tens of thousand of electronically filed claims were lost in what Aetna employees called a computerized black hole (*Id.* at ¶¶ 57–60);

- The integration of the Aetna and USHC computer systems was severely complicated by the fact that in the spring of 1997, Aetna changed patient identification numbers and reimbursement codes without alerting or giving new numbers and codes to provider billing personnel (*Id.* at ¶¶ 61–62);

- Consolidation of claims service centers and reduction of workforce compounded the computer systems' problems because Aetna had insufficient employees to handle the unpaid claims (*Id.* at ¶¶ 63–65); and

- Aetna experienced serious difficulties in negotiating pre-existing and new provider contracts on more favorable terms (*Id.* at ¶ 66).

Plaintiffs further allege that after concealing its integration and financial problems, Aetna announced, before the opening of the market on September 29, 1997, that its third quarter earnings would be 25% below analysts' estimates and that it would increase its medical claims reserves by $75–105 million because of problems associated with the merger. According to Plaintiffs, the price of Aetna's common stock fell that day as a result of Aetna's announcement and closed down $9.50 per share at $81.00 per share. Before the September 29 announcement, Defendant Abramson sold 1,350,000 shares of Aetna common stock for total proceeds of approximately $129,000,000, and Defendant Compton sold 90,000 shares of Aetna common stock for total proceeds of approximately $8,500,000.

Plaintiffs' Amended Complaint contains the following claims: First Claim (violation of Section 10(b) and Rule 10b–5 against all Defendants); Second Claim (violation of Section 20(a) against the individual Defendants); Third Claim (violation of Section 20A(a) against Defendant Abramson); and Fourth Claim (violation of Section 20A(a) against Defendant Compton).

## II. LEGAL STANDARD

A claim may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the plaintiff can prove no set of facts in support of the claim that would entitle her to relief. *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir.1994). The reviewing court must consider only those facts alleged in the complaint and accept all of the allegations as true. *Id.; see also Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989) (holding that in deciding a motion to dismiss for failure to state a claim, the court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the nonmoving party").

## III. DISCUSSION

### A. Allegations Made on Information and Belief

■ The introductory paragraph of Plaintiffs' Amended Complaint reads as follows:

Plaintiffs, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning plaintiffs, which allegations are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, the investigation made by plaintiffs' attorneys, which investigation included, without limitation: (a) review and analysis of filings made by Aetna, Inc. ("Aetna" or the "Company") with the Securities and Exchange Commission ("SEC"); (b) review and analysis of securities analysts' reports concerning Aetna; (c) review and analysis of press releases and other publications disseminated by defendants; and (d) investigation by plaintiffs' counsel of other sources of information regarding certain of the events described herein. Further facts relating to the securities violations alleged herein are exclusively within the control of defendants.

(Am.Compl. at 1.) By operation of this paragraph, all of the allegations in the Amended

Complaint, except those specifically concerning the Plaintiffs, must be read with the prefatory phrase "upon information and belief."

In their Motion, Defendants argue that the Amended Complaint must be dismissed because it does not provide the specificity required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C.A. § 78u–4 (West 1997), regarding the foundation of their attorneys' allegations. (Defts.' Mot. at 13.)[2] In particular, Defendants maintain that Plaintiffs' failure to identify with any particularity the source of their beliefs warrants the dismissal of the Amended Complaint. The Court agrees.

Under the PSLRA, a complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The court in *In re Health Management Sys. Inc. Sec. Litig.*, No. 97 Civ. 1865, 1998 WL 283286, at *3 (S.D.N.Y. June 1, 1998), held that an introductory paragraph containing information and belief allegations, strikingly similarly to the one at issue here, did not satisfy the pleading requirements of the PSLRA. Plaintiffs' information and beliefs allegations, like those at issue in *Health Management*, provide little, if any, specificity about the foundation for their attorneys' allegations. In particular, Plaintiffs' allegations fail to indicate what Securities and Exchange Commission ("SEC") filings and analysts' reports on Aetna that Plaintiffs relied on. Moreover, Plaintiffs fail to identify what "other publications disseminated by defendants" and "other sources of information" were reviewed.

In reaching its decision that Plaintiffs' information and belief allegations are insufficient, the Court has reviewed the relevant legislative history. The Court finds that Congress intended to impose on plaintiffs in securities fraud cases a heightened standard of pleading allegations on information and belief, which can be satisfied by identifying the sources upon which such beliefs are based. *In re Silicon Graphics, Inc. Securities Litig.*, 970 F.Supp. 746 (N.D.Cal.1997) (information and belief allegations that failed to identify the sources of the information did not satisfy the requirements of the PSLRA). As explained in *Silicon Graphics,*

> The degree of specificity required by the [PSLRA] in cases pled on information of [sic] belief was the subject of some debate in Congress. Arguing against [the] requirement that plaintiffs state with particularity all facts on which their beliefs are formed, Representative Bryant expressed concern that
>
>> at the beginning of the case plaintiff would have to set forth "with specificity all information," they have to give all the information in advance that forms the basis for the allegations of the plaintiff, meaning any whistle-blower within a securities firm involved would have to be uncovered in the pleadings in the very, very beginning.
>
> 141 Cong.Rec. H2848 (Mar. 8, 1995). Representative Dingell agreed, noting that "you must literally, in your pleadings, include the names of confidential informants, employees, competitors, Government employees, members of the media, and others who have provided information leading to the filing of the case." 141 Cong.Rec. H2849 (Mar. 8, 1995). Despite these concerns, Congress rejected Rep. Bryant's proposed amendment, which would have permitted plaintiffs to plead simply facts that support their beliefs. See 141 Cong. Rec. H2848 (Mar. 8, 1995).
>
> Because Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language, the Court concludes that plaintiffs must plead the sort of information described by Reps. Bryant and Dingell to

---

**2.** The citation to "Defts.' Mot." refers to the Motion to Dismiss filed by Defendants Aetna, Compton, and Huber. Defendant Abramson's Motion incorporates by reference all of the arguments raised in the Motion filed by Defendants Aetna, Compton, and Huber. In addition, he advances certain arguments based on his position as an outside director of Aetna, which the Court will address where appropriate.

meet the requirements of the [PSLRA] as enacted.

*Id.* at 763–64 (citation and quotation omitted).

The Court is unpersuaded by Plaintiffs' argument that they have alleged facts in their Amended Complaint to support their information and belief allegations and so have satisfied the requirements of Section 78u–4(b)(1) of the PSLRA. With very few exceptions, the "facts" alleged in the Amended Complaint are pled on information and belief. Essentially, Plaintiffs argue that they can satisfy the heightened pleading requirement for information and belief allegations by facts alleged on information and belief. If the Court were to accept this circular reasoning, the statute's requirement that a securities fraud complaint "state with particularity all facts on which that belief is formed" would be completely eviscerated.

For the above reasons, the Court will dismiss Plaintiffs' Amended Complaint for failure to comply with the pleading requirements of the PSLRA. In amending their Amended Complaint, Plaintiffs must state with particularity the sources of the facts that they allege on information and belief.

Although the Court will dismiss the Amended Complaint for failure to comply with the PSLRA's information and belief pleading standard, the Court will address Defendants' other challenges to the sufficiency of the Amended Complaint.

## B. *Section 10(b) of the Exchange Act*

Plaintiffs assert a securities fraud claim against all Defendants under Section 10(b) and Rule 10b–5. Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b).

 To state a claim under Section 10(b) and Rule 10b–5, Plaintiffs must establish the following: (1) that Defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) that Defendants acted with scienter; and (3) that Plaintiffs' reliance on Defendants' misstatement caused them injury. *In re Burlington Coat Factory Securities Litig.,* 114 F.3d 1410, 1417 (3d Cir.1997). Because a claim under Section 10(b) and Rule 10b–5 is a claim for fraud, Plaintiffs must also satisfy the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil procedure. *Id.* at 1417–18. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).

The PSLRA imposes additional pleading requirements for the elements of a securities fraud claim. Under the PSLRA, a complaint must specify "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). A complaint also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Failure to satisfy these pleading requirements results in dismissal. 15 U.S.C. § 78u–4(b)(3).

Defendants seek the dismissal of Plaintiffs' 10–b(5) claims on the following grounds: (1) that the purported misrepresentations and omissions fail to state a claim for securities fraud; (2) that Plaintiffs' allegations are inactionable because they amount to nothing more than mismanagement claims; (3) that Plaintiffs have failed to meet the heightened requirements of the PSLRA for pleading scienter; (4) that Plaintiffs have failed to plead sufficient facts to attribute analysts' statements to Defendants; and (5) that Plaintiffs' accounting allegations fail to state a fraud claim.[3] In addition, Defendant

---

**3.** As noted, Defendants argue that Plaintiffs have failed to adequately plead two of the required elements of a securities fraud claim—that is, that Defendants made materially false or misleading

Abramson argues that the alleged misleading statements and omissions cannot be attributed to him under the "group published information" presumption. The Court will address each of these arguments in turn.

### 1. The Alleged Misleading Statements

■■■ "[T]he first step for a Rule 10b–5 plaintiff is to establish that defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." *In re Burlington Coat Factory Securities Litig.*, 114 F.3d at 1417. Plaintiffs' 10b–5 claims are based on alleged materially misleading statements contained in four different press releases issued by Aetna in 1997 on March 6, May 6, July 25, and August 5.[4]

#### a. March 6, 1997 Press Release

■■ On March 6, 1997, Aetna issued a press release announcing that Joseph T. Sebastianelli was named President of Aetna. Plaintiffs allege that the following statement made by Compton, then Chairman of the Aetna Board, contained in the March 6 release was misleading and actionable under the securities laws:

> Joe has done a great job leading the rapid and *successful integration* of the health business and creating a winning strategy for the health business going forward. Decisions have been made and implemented quickly, and *the business is on track to meet all the objectives that were set at the time of the merger.*

(Am.Compl. at ¶ 49, emphasis added by Plaintiffs.)

Plaintiffs allege that by issuing this press release, "defendants represented that, as of March 6, 1997, the Aetna–USHC health business had already been 'successfully integrated' and that 'a winning strategy for the health business going forward' was in place." (*Id.* at ¶ 50.) Plaintiffs further allege that Defendants, by stating that "the business is on track to meet all objectives that were set at the time of the merger," adopted and reaffirmed the statements previously issued in the June 13, 1996 Joint Proxy Statement by Aetna and USHC, including, *inter alia,* the representations that:

● The annual increase in operating income is expected to be approximately $300 million (after tax) per year, and to be achieved within 18 months of the Merger Date.

● Expense reductions are expected to result from lowering medical costs and streamlining duplicative administrative functions. Reductions in administrative expenses are based on projected needs for overlapping functions such as information systems, provider contracting systems and medical credentialing, finance, accounting and other administrative functions, particularly in overlapping markets and the application of existing Aetna resources in serving U.S. Healthcare customers.

(*Id.* at ¶¶ 45–46, 50.)

Defendants argue that the statements contained in the March 6 release are not actionable because: (1) the statements are not material, but rather constitute "puffing" statements related to Sebastianelli's accomplishments; (2) the prior statements by Aetna in the June 12, 1996 proxy materials, which Plaintiffs allege were adopted and re-

statements and that Defendants acted with the requisite scienter. Defendants do not challenge the reliance element of the claim, which Plaintiffs plead by utilizing the "fraud on the market" theory. (Am.Compl. at ¶¶ 27–28.) By using this theory, Plaintiffs do not need to show that they actually knew of the communications that contained the misrepresentations or omissions. "Plaintiffs are accorded the presumption of reliance based on the theory that in an efficient market the misinformation directly affects the stock prices at which the investor trades and thus, through the inflated or deflated price, causes injury even in the absence of direct reliance." *In re Burlington Coat Factory Securities Litig.*, 114 F.3d at 1419 n. 8 (citations omitted).

4. Misleading statements contained in press releases can form the basis for a 10b–5 claim. As the United States Court of appeals for the Third Circuit ("Third Circuit") has explained, "[t]he private right of action under Section 10(b) and Rule 10b–5 reaches beyond statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false and misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Securities Litig.*, 114 F.3d at 1417 (citations omitted).

affirmed in the March 6 release, were made before the class period and are therefore immaterial as a matter of law; and (3) to the extent that the March 6 release adopted and reaffirmed these earlier statements, under the "bespeaks caution" doctrine, the cautionary language that accompanied the statements in the proxy materials renders the alleged omissions and misrepresentations immaterial as a matter of law.

 A statement or omission is material if there is a "substantial likelihood that, under all the circumstances, the [statement or omission] would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, (1976). As the Third Circuit has explained, "the issue is whether there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor." *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 280 n. 11 (3d Cir.1992) (citation and quotation omitted). "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 450, 96 S.Ct. at 2133. The district court, however, can rule that the allegations are inactionable as a matter of law "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Id.*

### (i) *"Puffing" Statements*

 "Puffing" statements—that is, vague expressions of corporate optimism and expectations about a company's prospects—are not actionable because reasonable investors do not rely on such statements in making investment decisions. *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 57–58 (2d Cir.1996). However, "[i]f a statement is material, then it cannot be puffing." *Voit v. Wonderware Corp.*, 977 F.Supp. 363, 370 (E.D.Pa.1997) (citing *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200 (3d Cir.

1990)). Defendants argue that the statements contained in the press release constitute generalized statements of optimism, and as such are not material.

The March 6 release contains statements that clearly were meant to tout the accomplishments of Sebastianelli (*e.g.*, "Joe has done a great job"). Although such a statement, standing alone, would constitute a puffing statement, the statement about Sebastianelli was tied to the very issue about which Plaintiffs complain—the integration of Aetna and USHC. The release describes these efforts as "successful." Plaintiffs allege that this statement was materially misleading because the integration was rife with serious problems concerning computer system incompatibility, "black hole" claims, code conversion without notification, consolidation of claims service centers and reduction in workforce, and the negotiation of provider contracts. (Am.Compl. at ¶¶ 54–66.) In addition, the release stated that the Aetna was "on track to meet all objectives that were set at the time of the merger," a statement concerning the current status of the integration efforts. Plaintiffs also allege that this statement was false because Aetna was not on track to meet the objectives set forth in the proxy materials.

The general rule is that questions of materiality are fact-sensitive determinations to be made by the trier of fact. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 450, 96 S.Ct. at 2133. Alleged misrepresentations are inactionable as a matter of law only when reasonable minds cannot differ on the question of materiality. *Id.* The Court finds that the representations at issue here cannot be characterized as ones that would be so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality. Therefore, the Court rejects Defendants' argument that the statements in the March 6 release are immaterial as a matter of law.

### (ii) *Proxy Statements*

 Defendants correctly point out that statements made before or after the class period are not actionable and that the proxy statements were initially made before the commencement of the class period. Never-

theless, Defendants' argument that these statements are therefore immaterial as a matter of law misses the mark. Plaintiffs allege that the March 6 release adopted and reaffirmed the earlier proxy statements. In other words, by explicitly referring to the objectives for the merger that were set forth in the proxy materials, and by representing that "the business is on track to meet all the objectives that were set at the time of the merger," Defendants effectively reissued those earlier statements in the March 6 release. Consequently, the statements were made within the class period and are therefore properly the subject of Plaintiffs' law suit.

### (iii) *"Bespeaks Caution" Doctrine*

██ Defendants' final argument is that even if the earlier proxy statements were adopted and reaffirmed in the March 6 release, the release also adopted and reaffirmed the following cautionary language that accompanied those statements:

> THE ESTIMATES ARE BASED UPON A VARIETY OF ASSUMPTIONS RELATING TO THE BUSINESS OF U.S. HEALTHCARE AND AETNA WHICH MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE SUBJECT TO MATERIAL RISKS AND UNCERTAINTIES AND MANY OF WHICH ARE BEYOND THE CONTROL OF AETNA AND U.S. HEALTHCARE. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE ESTIMATED SYNERGIES WILL BE REALIZED, AND ACTUAL SYNERGIES, IF ANY, MAY VARY MATERIALLY FROM THOSE SHOWN.

Defendants argue that under the "bespeaks caution" doctrine, any alleged misrepresentations or omissions in the proxy materials were rendered immaterial as a matter of law.

██ The "bespeaks caution" doctrine serves to neutralize forward-looking statements concerning forecasts and projections. As the Third Circuit has explained,

> [W]hen an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim ... In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

*In re Westinghouse Securities Litig.,* 90 F.3d 696, 707 (3d Cir.1996) (quoting *In re Donald J. Trump Casino Securities Litig.,* 7 F.3d 357, 371–72 (3d Cir.1993)).

Although the cautionary language contained in the proxy materials dealt with projections and forecasts about the proposed merger of Aetna and USHC, at the time that the proxy statements were adopted and reissued in the March 6 press release, the merger had already occurred. As such, the press release referred to matters of present fact— that is, Aetna was "on track to meet all the objectives" set forth in the earlier proxy materials. The "bespeaks caution" doctrine does not apply to presently known facts. *Voit v. Wonderware, Corp.,* 977 F.Supp. at 371. Therefore, Defendants cannot rely on the "bespeaks caution" doctrine to neutralize the alleged misrepresentations set forth in the March 6 release.

For these reasons, the Court finds that Plaintiffs' allegations regarding misleading statements contained in the March 6 release are sufficient to support their 10b–5 claim.

### b. *May 6, 1997 Press Release*

██ In a press release issued on May 6, 1997, Defendant Compton, Chairman of the Aetna Board, said

> Our efforts to reposition Aetna began to pay off in the first quarter of 1997 .... earnings from all three of our core businesses ... grew at double-digit rates from the prior-year quarter. In addition, our increased cash flow will provide significant financial flexibility to continuously increase shareholder value.
>
> \* \* \* \* \* \*
>
> Aetna U.S. Healthcare significantly lowered operating expenses with the improved cost structure put in place last year.

(Am. Compl. at ¶ 79.) This press release also disclosed the financial results for the first

quarter ending March 30, 1997. In announcing these results, the press release stated that "[c]ommercial HMO medical costs were essentially flat." (*Id.* at ¶ 78.)

According to Defendants, Plaintiffs' conclusion that the statement regarding flat medical costs was false is based on an improper comparison of the statement in the press release to Aetna's contemporaneous assertion in its Form 10–Q filing with the SEC for the first quarter of 1997 that commercial medical costs "increased by 5%" per member per month. Plaintiffs' claim, however, is not based on a comparison with that portion of the Form 10Q. Rather, the statement in the release that costs were flat (*i.e.*, had not increased) for the first quarter of 1997 was based on a comparison to the fourth quarter of 1996. As explained by Plaintiffs,

> [t]he significance of this statement was that, although costs had increased from the same period last year, that was to be expected since Aetna was in the midst of its integration. However, the fact that costs had not increased from the immediately prior quarter, implied that costs were coming under control and that the integration was successfully proceeding.

(Pls.' Opp. at 30.) Plaintiffs allege that this statement was false because medical costs were not under control. Construing the pleadings in the light most favorable to the Plaintiffs, as the Court must, the Court finds the allegations concerning the flat medical costs contained in the May 6 release are sufficient to state a 10b–5 claim.

 Defendants also argue that Compton's statement in the May 6 release that "Aetna U.S. Healthcare significantly lowered operating expenses with the improved cost structure put in place last year" is forward looking and therefore protected under the safe harbor of the PSLRA. The Court finds that Defendants argument is misplaced. A forward looking statement may include: (A)

statements containing a projection of revenues, income (including income loss), earnings per share (including earnings loss), capital expenditures, dividends, capital structure, or other financial items; (B) statements of the plans and objectives of management for future operations; (C) statements of future economic performance; and (D) statements of the assumptions underlying or relating to the statements described in (A), (B), and (C). 15 U.S.C. § 78u–5(i)(1)(A)–(D). Defendant Compton's statement does not fit into any of the definitions set forth in the PSLRA for a forward looking statement. Therefore, the safe harbor provisions of the PSLRA do not apply.

For these reasons, the Court finds that Plaintiffs' allegations regarding misleading statements contained in the May 6 release are sufficient to support their 10b–5 claim.[5]

#### c. *July 25, 1997 Press Release*

 In a July 25, 1997 press release, Aetna named Richard Huber as President and CEO of Aetna. This release states that Huber was an integral force in "the merger and the highly successful integration at Aetna U.S. Healthcare." (Am.Compl. at ¶ 83.) Defendants argue that the statement about Huber constitutes a "puffing statement" and is therefore immaterial as a matter of law. The Court agrees. Although both the March 6 and the July 25 releases announce the appointment of corporate officers, laud their accomplishments, and describe the integration of Aetna and USHC as "highly successful," there is a critical difference between these two releases. In the July 25 release, the description of the integration as "highly successful," without more, is a generalized statement that is inactionable as a matter of law because it constitutes mere "puffery" and would be understood by reasonable investors as such. *Shapiro v. UJB Financial Corp.,* 964 F.2d at 284 n. 12; *Wallace v. Systems & Computer Technology Corp.,* Civ.A. No. 95–

---

5. Defendants maintain that the statement by Defendant Compton that "[o]ur efforts to reposition Aetna began to pay off in the first quarter of 1997" and that "[o]ur increased cash flow will provide significant financial flexibility to continuously increase shareholder value" are forward looking statements and therefore are protected by the safe harbor protections in the PSLRA for

forward-looking statements accompanied by meaningful cautionary statements. Plaintiffs, however, have advised the Court that their claim is not based on these statements by Defendant Compton. (Pls.' Opp. at 30.) Therefore, this aspect of Defendants' challenge to the May 6 release is moot.

6303, 1997 WL 602808, at * 9 (E.D.Pa. Sept. 23, 1997). The generalized optimistic statement about the integration is also linked to the accomplishments of Defendant Huber. As such, a reasonable investor would view such a statement as one that favorably reflects on the abilities of Defendant Huber, not as information on the relative success, or lack thereof, of the integration of Aetna and USHC.

In contrast, the laudatory statements about Sebastianelli and the description of the integration as "highly successful" in the March 6 release are directly tied to the objectives set forth in the proxy materials for the Aetna/USHC merger. As such, the statements in the March 6 release are not mere puffing statements but constitute concrete representations about the success of the merger, as gauged by the objectives in the proxy materials. The statements in the July 25 release about Defendant Huber and the success of the integration are not linked in any way to the proxy objectives, as the March 6 statements are. For that reason, the Court finds that the alleged misrepresentations contained in the July 25 release about Defendant Huber were puffing statements and as such are immaterial as a matter of law. Plaintiffs cannot base their 10b–5 claim on the statements contained in the July 25 release.

### d. *August 5, 1997 Press Release*

■ On August 5, 1997, Aetna issued a press release that contained the following statement:

> Second quarter 1997 earnings include a $20.2 million after-tax benefit from a reduction in the severance and facilities reserve, as the integration with U.S. Healthcare proceeds at less cost than initially expected.

(Am. Compl. at ¶ 86.) Plaintiffs allege that this statement was made "to once again deceive the investing public into believing that the merger and integration between Aetna and USHC was seamless and successful." (*Id.*) Plaintiffs further allege that "[t]his reserve [the severance and facilities reserve] was initially recorded to account for the merger and integration costs. Defendants' disclosure of the decrease in the reserve misled the investing public into believing that the merger and integration were successful and not spawning difficulties of their own." (*Id.*)

Defendants argue that the statements included in this release were historical fact and thus not actionable—"the fact that the severance and facilities reserve was reduced indicates only (and correctly) that those items covered by the reserve, such as severance pay and rent paid on closed facilities, cost less than initially anticipated, not that the integration was problem-free." (Defts.' Mot. at 26.)

■ There is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or volunteered, not misleading. *Kline v. First Western Gov't Securities*, 24 F.3d 480, 491 (3d.Cir.1994). Because Defendants volunteered that one reserve had been reduced, this arguably created a misleading impression that the costs associated with the integration were decreasing when in fact they were increasing. Under these circumstances, Plaintiffs' allegations that the August 5 release contained materially misleading representations are sufficient to support their 10b–5 claim.

### e. *Group Pleading Doctrine*

In attributing the alleged misleading statements and omissions to the individual Defendants, Plaintiffs allege the following:

> It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's [Aetna's] public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers and/or directors of Aetna, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning

the Company and its business, operations, prospects, growth, finances, recognition and reserve policies and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of the federal securities laws.

(Am. Compl. at ¶ 16.)

██ By making these allegations, Plaintiffs seek the benefit of the so-called group pleading doctrine.[6] Under this doctrine, the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents, such as annual reports, prospectuses, registration statements, press releases, or other "group published information" that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987). In the typical scenario, the group pleading doctrine is used, as Plaintiffs have done here, to attribute group published information to senior executives of a corporate defendant. *Id.*

██ In certain limited circumstances, the doctrine has been extended to outside directors. In order for the doctrine to apply to an outside director, a Rule 10b–5 plaintiff must allege "that an outside director either participated in day-to-day corporate activities, or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times." *In re GlenFed, Inc., Securities Litig.*, 60 F.3d 591, 593 (9th Cir.1995). As a prerequisite for group pleading that involves an outside director, operational involvement on the part of the outside director must be pled. *Id.* Allegations that the outside director merely held a position on a committee that is responsible for overseeing the corporation's financial or disclosure activities are insufficient under the group pleading doctrine. *Id.*

██ Because Plaintiffs do not allege that Defendant Abramson made any of the alleged misleading statements, they must rely on the group pleading doctrine to attribute the statements to him. Mindful of the requirements of the group pleading doctrine, Plaintiffs allege that Defendant Abramson participated in the day-to-day activities of Aetna and had access to confidential proprietary information concerning Aetna, presumably by virtue of his position on the Finance Committee and his consulting agreement with Aetna. Defendant Abramson argues that the group pleading allegations against him are inadequate.[7] Although Plaintiffs include the right buzz words, the Court finds that their allegations concerning Defendant Abramson's involvement with the operational affairs of Aetna and his special relationship are merely conclusory and as such are insufficient.

First, Plaintiffs treat the senior management Defendants, Compton and Huber, and the outside director Defendant, Abramson, as a unit for pleading purposes, even though an outside director's relationship to and involvement with the corporation typically differs from that of inside, high level executives. *In re GlenFed, Inc., Securities Litig.*, 60 F.3d at 593. Second, although Plaintiffs'

---

6. This doctrine is also referred to as the "group published information" presumption.

7. In their Motion, Defendants Compton and Huber do not challenge Plaintiffs' use of this pleading device. The Court notes in this regard that Defendant Compton is quoted as making the alleged misleading statement in the March 6 release and one of the alleged misleading statements in the May 6 release.

Defendant Abramson does not challenge the validity of the group pleading doctrine under the PSLRA, but rather argues that it cannot be used by Plaintiffs against him. Although it is unclear whether the group pleading doctrine survives under the PSLRA, the Court will assume for the purposes of this Motion that the group pleading doctrine is still viable. *In re Stratosphere Corp. Securities Litig.*, 1 F.Supp.2d 1096, 1108 (D.Nev. 1998) (the heightened pleading standards imposed by the PSLRA did not abolish the group pleading doctrine); *but see Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 915–16 (N.D.Tex.1998) (the PSLRA codifies a ban on the group pleading doctrine).

boilerplate allegations of day-to-day involvement in Aetna's affairs are plausible as to Defendants Compton and Huber, they are woefully inadequate as to an outside director such as Defendant Abramson. *In re Silicon Graphics, Inc. Securities Litig.*, No. C 96–0363, 1996 WL 664639, at *8 (N.D.Cal. Sept.25, 1996). Finally, Plaintiffs have failed to allege any facts to support their allegations that Defendant Abramson was involved in the day-to-day operations of Aetna after the Aetna–USHC merger and was privy to information relevant to the alleged misleading statements by virtue of his position on the Finance Committee and his consulting agreement with Aetna. Under these circumstances, the Court declines to apply the group pleading doctrine to Defendant Abramson. Accordingly, the Court finds. that Plaintiffs have not adequately pled that any of the alleged misleading statements can or should be attributed to Defendant Abramson.

### 2. *Aetna Mismanagement*

■ Defendants next argue that Plaintiffs' allegations of securities fraud amount to nothing more than mismanagement claims. "The securities laws do not create liability for breaches of fiduciary duty or mismanagement." *In re Donald J. Trump Casino Securities Litig.*, 7 F.3d at 376. However, a complaint is not subject to dismissal if plaintiffs plead "specific facts permitting the inference that defendants were intentionally concealing [mismanagement]." *In re Westinghouse Securities Litig.*, 90 F.3d at 711. Moreover, if it alleges that "a defendant was aware that mismanagement had occurred and made a material public statement of corporate affairs inconsistent with the existence of the mismanagement," then a complaint does state an actionable misrepresentation. *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir.1992).

Here, Plaintiffs have adequately pled that Defendants made misrepresentations and omissions with respect to the success of the integration efforts. It may be that the problems with the integration that Aetna allegedly experienced stemmed from mismanagement. But this is not the focus of Plaintiffs' claim. Rather, Plaintiffs allege that Defen-

dants made material misrepresentations and failed to disclose material facts relating to the integration problems associated with the merger. Therefore, the Court rejects Defendants' argument that Plaintiffs' allegations are merely examples of mismanagement.

■ Defendants further argue that even if the Court were to consider Plaintiffs' allegations that Defendants misrepresented the merger as "successful," this is the type of vague positive statement that is not actionable under the securities laws since such a statement is not material. Defendants are correct that certain vague statements are immaterial as a matter of law. For example, in *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d at 201, the Third Circuit held that a vague statement, such as "this bond is marvelous," is immaterial because a reasonable investor would not rely on it in considering the total mix of available information. The Court finds that the statement contained in the March 6 release concerning the success of the merger does not fall within the ambit of *Hoxworth*. As discussed in Section III.B.1.a above, this statement specifically referred to stated objectives in the proxy materials. Therefore, it is not the type of vague, generalized statement that is immaterial as a matter of law.

### 3. *Scienter*

■ Defendants maintain that Plaintiffs have inadequately pled scienter under the PSLRA, which provides that a plaintiff's complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Although the pleading of scienter is clearly necessary to state a securities fraud claim, the PSLRA fails to define that "required state of mind" or to identify a standard for pleading it. The Supreme Court has addressed the first issue—the requisite state of mind in a securities fraud case is scienter, which is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). The second issue—the standard for pleading scienter

under the PSLRA—has not yet been decided by the Supreme Court or the Third Circuit.

Before the PSLRA was enacted, the Third Circuit followed the pleading standards set forth by the United States Court of Appeals for the Second Circuit ("Second Circuit"), which required a plaintiff to plead a strong inference of scienter by "(a) alleging facts to show that Defendants had both a motive and a clear opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington Coat Factory Securities Litig.*, 114 F.3d at 1418 (citing *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995)).

There has been much debate among the commentators and the courts as to whether the PSLRA simply codified the Second Circuit's pleading standards or whether Congress rejected the recklessness and motive and opportunity standards in favor of the more stringent conscious knowledge standard. In contrast to the clear legislative history on information and belief allegations, the legislative history on Section 78u–4(b)(2) is murky. *Berkowitz v. Conrail, Inc.*, Civ. A.No. 97–1214, 1997 WL 611606, at *15–16 (E.D.Pa. Sept.25, 1997). Some courts have relied on legislative intent to support the holding that the PSLRA codifies the Second Circuit's pleading standards. *E.g., Sloane Overseas Fund v. Sapiens Int'l Corp.*, 941 F.Supp. 1369, 1377 (S.D.N.Y.1996). Other courts have held that in passing the PSLRA, Congress intended to establish even stronger pleading standards than those recognized in

the Second Circuit. *E.g., Voit v. Wonderware Corp.*, 977 F.Supp. at 374 (the PSLRA scienter requirement is intended "to surpass the Second Circuit's 'motive and opportunity' and 'recklessness' standards" and requires that a plaintiff must allege facts showing conscious behavior by the defendants).[8]

This Court has considered the legislative history of the PSLRA submitted by parties, has consulted numerous articles by commentators on the PSLRA's requirements for pleading scienter, and has read a full range of cases in which courts have wrestled with this issue. Based on this review, the Court concludes that Congress intended to codify the Second Circuit's standards for pleading scienter. This view is consistent with the language of the PSLRA, which expressly adopts the Second Circuit's requirement that plaintiffs plead facts to establish a "strong inference" of scienter. It also is consistent with the PSLRA's underlying purpose to protect companies and their shareholders and employees against meritless "strike" suits by heightening pleading standards. By codifying the Second Circuit's pleading standards, which were the most exacting standards in existence prior to the enactment of the PSLRA, Congress ensured the national use of a uniform, stringent standard for pleading scienter.

The Court's conclusion that the PSLRA codifies the Second Circuit's pleading standards is reinforced by the legislative history on the Securities Litigation Uniform Standards Act of 1998 (the "Standards Act"), P.L. 105–353, 112 Stat. 3227 (1998).[9] The Stan-

8. The Second Circuit permitted the pleading of scienter by alleging facts to show conscious behavior, recklessness, or motive and opportunity. Those courts that have held that the PSLRA establishes a stronger standard for pleading scienter maintain that Congress rejected the use of the less rigorous recklessness or motive and opportunity standards in favor of the more stringent conscious behavior standard. In so doing, the reasoning goes, Congress established a stronger pleading standard than the Second Circuit's.

9. The Court is aware that the legislative history concerning the Standards Act does not necessarily establish legislative intent with respect to the PSLRA. *Blanchette v. Connecticut General Ins. Corps.*, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974) ("post-passage remarks of

legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before [an Act's] passage"); *In re Glenayre Technologies, Inc. Securities Litig.*, No. 96 CIV. 8252, 1998 WL 915907, at *2 (S.D.N.Y. Dec.30, 1998). The Standards Act, however, was follow-up legislation to the PSLRA. Therefore, the caution regarding post-passage remarks of legislators may not apply under these circumstances. *See Sturm v. Marriott Marquis Corp.*, 26 F.Supp.2d 1358, 1368–69 (N.D.Ga.1998) (use of the legislative history of the Standards Act as evidence of the legislative intent of Congress on the scienter pleading standards of the PSLRA). Nevertheless, the Court conducted an independent inquiry into the legislative history of the PSLRA to arrive at its conclusion regarding legislative intent with respect to the standard for pleading scienter. The Court includes the re-

dards Act makes Federal court the exclusive venue for most securities class action lawsuits. The purpose of the Standards Act was "to prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State, rather than Federal Court." Standards Act § 2. Congress was concerned that the filing of securities actions in state court frustrated the objectives of the PSLRA. *Id.* Because Congress enacted the Standards Act to preclude, in effect, the litigation of major securities class actions in state court, Congress believed that it was important to clarify that the PSLRA did not change the existing law on scienter under Rule 10b–5. In that regard, the Statement of Managers in the Conference Report on the Standards Act states as follows:

> It is the clear understanding of the managers that Congress did not, in adopting the [PSLRA], intend to alter the standards of liability under the Exchange Act.

> The managers understand, however, that certain Federal district courts have interpreted the [PSLRA] as having altered the scienter requirement. In that regard, the managers again emphasize that the clear intent in 1995 and our continuing intent in this legislation is that neither the [PSLRA] nor [the Standards Act] in any way alters the scienter standard in Federal securities fraud suits.

> Additionally, it was the intent of Congress ... that the [PSLRA] establish a heightened uniform Federal standard on pleading requirements based upon the pleading standard applied by the Second Circuit Court of Appeals. Indeed, the express language of the [PSLRA] itself carefully provides that plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." The Managers emphasize that neither the [PSLRA] nor [the Standards Act] makes any attempt to define that state of mind.

*Id.,* Joint Explanatory Statement of the Committee of Conference (Statement of Managers) at 3–4.

marks of legislators concerning the Standards

The Court reaches the same conclusion that the PSLRA codified the Second Circuit pleading standards under an alternative interpretation of the applicable legislative history. Before the passage of the legislation, Senator Arlen Specter proposed an amendment that explicitly set forth the Second Circuit pleading standards, including conscious behavior, recklessness, and motive and opportunity. Amend.1985 § 240, 104th Cong., 1st Sess. (1995). Although this amendment passed, the Conference Committee later eliminated this language from the bill's final version. The rejection of the Specter Amendment could be viewed as evidence that Congress intentionally chose not to incorporate the Second Circuit's pleading standard.

Had the Court adopted this view of the PSLRA's legislative history, it would have looked to precedent from the Third Circuit for the appropriate pleading standard. The Third Circuit has adopted the Second Circuit's pleading standards. *In re Burlington Coat Factory Securities Litig.,* 114 F.3d at 1418. Therefore, under either view of the legislative history of Section 78u–4(b)(2), the Court finds that Plaintiffs can plead scienter by stating with particularity facts that show that Defendants had both a motive and a clear opportunity to commit fraud or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

#### a. *Conscious Misbehavior*

#### (i) *Defendants Compton and Huber*

■ Plaintiffs have filed an 83 page consolidated class action complaint that sets forth detailed and substantial allegations that give rise to a strong inference that Defendants Compton and Huber may have engaged in conduct with the conscious knowledge that their acts were in violation of the Exchange Act. *See In re Cephalon Sec. Litig.,* Civ.A.No. 96–0633, 1997 WL 570918, at * 2 (E.D.Pa. Aug.29, 1997). The Court reaches its decision concerning the adequacy of Plaintiffs' scienter allegations by analyzing the alleged misrepresentations and omissions in the context of the high level executive posi-

Act for illustrative purposes.

tions held by Defendants Compton and Huber at Aetna and the importance and significance of the acquisition of USHC by Aetna.

Plaintiffs allege that the merger of Aetna and USHC was a transaction valued at $8.9 billion, that the acquisition of USHC by Aetna was a major corporate undertaking by Aetna, and that Defendants Compton and Huber occupied the top corporate positions at Aetna during the period in which the two businesses were integrated into one corporation. In addition, Plaintiffs' Amended Complaint is replete with detailed allegations concerning operational problems (*e.g.,* incompatible computer systems, the consolidation of claims service centers, and the change of patient identification codes) that plagued Aetna as a result of its acquisition of USHC. Such problems affected a key aspect of Aetna's managed healthcare business: the processing of medical claims. The Court finds that the size and nature of the USHC–Aetna merger and the positions held by Defendants Compton and Huber, in conjunction with the factual allegations in the Amended Complaint concerning the operational problems at Aetna following the merger, provide strong circumstantial evidence that Defendants Compton and Huber, and by extension Defendant Aetna, knowingly made the misrepresentations and omissions concerning the success of the integration and its financial impact on Aetna. *In re Gaming Lottery Sec. Litig.,* Nos. 96 CIV 5567, 7527, 7936, 1998 WL 276177 (S.D.N.Y. May 29, 1998); *Epstein v. Itron, Inc.,* 993 F.Supp. 1314, 1325 (E.D.Wa.1998); *Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 143–45 (2d Cir.1991).

In arguing that Plaintiffs have failed to adequately allege scienter, Defendants rely heavily on *In re Advanta Corp. Securities Litig.,* Civ.A.No. 97–4343, 1998 WL 387595, at *7 (E.D.Pa. July 9, 1998), which held that "[a] director, officer, or even the president of a corporation often has superior knowledge and information, but neither the knowledge nor the information invariably attaches to

those positions." The Court agrees with the reasoning set forth in *Advanta* but finds that the facts of *Advanta* are very different from the facts present in this case.

In *Advanta,* the alleged fraud did not relate to the corporation's core business but rather concerned a change in the period for investigations of credit card holders who filed for bankruptcy. The court in *Advanta* refused to impute knowledge of this operational detail to the individual defendants in the absence of other allegations to support an inference of knowledge. In contrast to *Advanta,* the alleged fraud in this case relates to the core business of Aetna during the time period in which Defendants Compton and Huber were at Aetna's helm. Plaintiffs' Amended Complaint contains factual allegations concerning widespread integration problems at Aetna following its merger with USHC. These allegations provide strong circumstantial evidence that Defendants Compton and Huber had knowledge of undisclosed facts concerning the integration of the Aetna–USHC merger and its impact on Aetna's financial statements.[10] Therefore, the Court finds that Plaintiffs' allegations of scienter based on the conscious behavior standard are sufficient to state a 10b–5 claim against Defendants Aetna, Compton, and Huber.

### (ii) *Defendant Abramson*

The Court reaches a different result with respect to Defendant Abramson, an outside director of Aetna, a member of the Finance Committee of the Board, and a consultant to Aetna. Although Defendant Abramson was the Chairman and CEO of USHC at the time of the merger, he did not become an officer of Aetna after the merger of Aetna and USHC. In their Amended Complaint, Plaintiffs fail to adequately address this critical difference between Defendants Compton and Huber, on the one hand, and Defendant Abramson, on the other hand. Instead, Plaintiffs consistently lump all of the individual Defendants together for the pur-

10. The timing between the alleged false statements and the September 29 revelation that earnings were going to be significantly lower than expected may also support a finding of Defendants' knowledge of the falsity of the statements issued in the press releases. *See In re*

*Grand Casinos Inc., Securities Litig.,* 988 F.Supp. 1273, 1284 (D.Minn.1997) (revelations shortly after alleged false statements made can support an inference of earlier knowledge); *accord Powers v. Eichen,* 977 F.Supp. 1031, 1039–40 (S.D.Cal. 1997).

pose of pleading scienter. Such allegations can only pass muster under the PSLRA if Plaintiffs further allege that despite his status as an outside director, Defendant Abramson's relationship to Aetna after the merger was akin to that of an insider, such as Defendant Compton or Defendant Huber.

Plaintiffs attempt to provide this necessary link based on Defendant Abramson's membership on the Finance Committee and consulting agreement with Aetna. With respect to Defendant Abramson's role as consultant, Plaintiffs plead only that Defendant Abramson entered into a consulting agreement with Aetna, whereby he "agreed to advise the Chairman of Aetna regrading strategic business activities, marketing strategies and public relations efforts of [Aetna] and its combined Aetna–USHC operations." (Am. Compl. at ¶ 15(b)(iii).) The Amended Complaint is devoid of any allegations that Defendant Abramson actually provided any consulting advice to Aetna or was ever asked for such advice. Similarly, Plaintiffs fail to allege that Defendant Abramson was advised of the alleged adverse conditions at Aetna following the merger during meetings of the Board or the Finance Committee. Instead, based solely on his status as an outside director, member of the Finance Committee, and consultant to Aetna, Plaintiffs allege that Defendant Abramson knew of the integration problems that Aetna allegedly experienced after the merger. Plaintiffs conclude that "because of their positions with Aetna," all of the individual Defendants, including Defendant Abramson, "had access to the undisclosed information about [Aetna's] business, operations, revenue recognition and reserve policies, operational trends, finances, markets and present and future business prospects." (*Id.* at ¶ 15(c).) This type of conclusory allegation falls far short of what is required

under the PSLRA and what is necessary to plead scienter as to an outside director such as Defendant Abramson.

■ As discussed above, the Court's conclusion that Plaintiffs have adequately pled scienter under the conscious behavior standard as to Defendants Compton and Huber is derived in part on the strong inference of knowledge based on the executive positions they held with Aetna after the merger and the nature of Plaintiffs' securities fraud claim, which centers on internal, operational problems experienced at Aetna occurring after the merger. On the basis of the allegations in Plaintiffs' Amended Complaint, such an inference does not attach to Defendant Abramson. *Cf. In re Gaming Lottery Securities Litig.*, 1998 WL 276177, at * 7 (CEO and CFO found potentially liable for allegedly false and misleading company statements); *Epstein v. Itron*, 993 F.Supp. at 1326 ("facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers"). Because the Amended Complaint is devoid of specific factual allegations to support a strong inference of conscious misbehavior on the part of Defendant Abramson, the Court finds that Plaintiffs' allegations of scienter under this standard as to Defendant Abramson are insufficient.[11]

### b. *Motive and Opportunity*

■ As an alternative to conscious behavior and recklessness, Plaintiffs plead that Defendants had the motive and opportunity to manipulate the price of Aetna stock. Because the Court finds that Plaintiffs have adequately plead scienter as to Defendants Compton and Huber under the conscious behavior standard, the Court does not need to reach whether Plaintiffs' allegations of scien-

---

11. Similarly, the Court finds that Plaintiffs' allegations of scienter as to Defendant Abramson are insufficient under the recklessness standard. "Recklessness" is defined as "an extreme departure from the standards of ordinary care ... which presents a danger of misleading ... that is either known to the Defendant or is so obvious that the actor must have been aware of it." *Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 649 (3d Cir.1980). For a securities fraud claim, recklessness must be more than

just a lack of due care. The recklessness alleged must constitute evidence of fraud or its equivalent. *In re Phar–Mor, Inc. Securities Litig.*, 892 F.Supp. 676, 684 (W.D.Pa.1995); *Lachance v. Harrington*, 965 F.Supp. 630, 641 (E.D.Pa.1997) (recognizing a heightened recklessness standard for pleading scienter under the PSLRA). Plaintiffs' scienter allegations against Defendant Abramson are legally insufficient under this standard of heightened recklessness.

ter are sufficient under the motive and opportunity test as to these Defendants. The Court will, however, analyze whether Plaintiffs have adequately pled motive and opportunity as to Defendant Abramson.

Under the motive and opportunity test, Plaintiffs must show both that Defendant Abramson had the motive to commit the fraud and had a "clear opportunity" to do so. *In re Burlington Coat Factory Securities Litig.*, 114 F.3d at 1418. The Second Circuit has defined the terms "motive" and "opportunity" as follows: "Motive would entail concrete benefits that could be realized by one or more of the statements and wrongful disclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994). The Court finds that Plaintiffs' allegations concerning both motive and opportunity are insufficient.

#### (i) *Motive*

Plaintiffs have alleged that Defendants engaged in this scheme to inflate the price of Aetna stock in order to enhance the value of their personally-held Aetna stock.[12] (Am. Compl. at ¶ 117.) With respect to Defendant Abramson, Plaintiffs allege that his stock sales were "unusual in their amount and in their timing," and therefore are "highly probative" of his scienter. (*Id.* at ¶ 118.) Plaintiffs support their claim that Defendant Abramson's sales were unusual by alleging that he made the following two sales during the class period: (1) on April 15, 1997, he sold 5,278 shares at $86.88 per share, which resulted in proceeds totaling $458,522.64 and (2) on August 13, 1997, he sold 1,350,000

shares at $96.02, which resulted in proceeds of $129,627,000.00. (*Id.*)

Plaintiffs' allegations that Defendant Abramson was motivated to deceive the public to achieve an inflated stock price, thereby enhancing the value of his Aetna stock, is insufficient to support a strong inference of intent to defraud. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53–54 (2d Cir.1995). Defendant Abramson's alleged insider trading during the class period, however, may support a strong inference of scienter if such trading activity was unusual or suspicious.[13] *Id.* at 54; *In re Burlington Coat Factory Securities Litig.*, 114 F.3d at 1423 (to produce a strong inference of fraudulent intent based on insider trading, trading must occur at times and in quantities that were unusual or suspicious).

■ To determine whether trading activity was unusual or suspicious, courts consider the total amount of the insider's stock holdings, the profit made by the insider from sales during the class period, trades in the company's stock made prior to and following the class period, and the holdings and trading activity of the other individual defendants. *In re Burlington Coat Factory Securities Litig.*, 114 F.3d at 1423; *Blum v. Semiconductor Packaging Materials Co., Inc.*, Civ.A. No. 97–7078, 1998 WL 254035, at *4 (E.D.Pa. May 5, 1998). Plaintiffs' allegations concerning the sales by Defendant Abramson are insufficient to establish that such sales were unusual or suspicious. Consequently, Plaintiffs' allegations concerning Defendant Abramson's motive are insufficient.

---

**12.** With respect to motive, Plaintiffs also allege that "[t]he Individual Defendants engaged in such a scheme to inflate the price of Aetna common stock in order to protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby." (Am. Compl. at ¶ 117.) This allegation obviously does not pertain to Defendant Abramson since he did not occupy an executive position with Aetna during the class period.

**13.** Plaintiffs have an additional stumbling block in alleging motive based on Defendant Abramson's sales of Aetna stock. The case law makes clear that to establish motive based on stock

sales, such sales must be made by "insiders." During the entire class period, Defendant Abramson was an outside director. As such, the sale of Aetna stock by one of Aetna's outside directors does not give rise to a strong inference of an intent to defraud. *Acito v. IMCERA Group, Inc.*, 47 F.3d at 54. The Court is aware of Plaintiffs' argument that although he was an outside director, Defendant Abramson was the functional equivalent of a corporate insider. (Pls.' Opp. at 61 n. 23.) However, as explained above, Plaintiffs have failed to allege facts to support the conclusion that Defendant Abramson was an insider.

#### (ii) *Opportunity*

Plaintiffs allege that Defendants, including Defendant Abramson, materially misled the investing public, thereby inflating the price of Aetna common stock. (Am.Compl. at ¶ 100.) The means to perpetrate the fraud included misrepresentations in Aetna's press releases and in financial statements. In order to satisfy the opportunity prong of the motive and opportunity test, Plaintiffs must allege that Defendant Abramson had the opportunity to carry out the means. *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d at 1130.

Plaintiffs have failed to do so. Absent from the Amended Complaint are allegations that, despite his status as an outside director, Defendant Abramson had the means to cause Defendant Compton to make the statements he made, to cause Aetna to issue the press releases and alleged overstated financial statements that it did, or to cause Peat Marwick, Aetna's outside accountant, to issue its opinions concerning the accuracy of the financial statements.

Because Plaintiffs have failed to meet either the motive or opportunity prongs of the motive and opportunity test, the Court finds that Plaintiffs have failed to adequately plead Defendant Abramson's scienter under this standard.

#### 4. *Accounting Fraud*

■ In addition to alleging a violation of Section 10(b) with respect to the misrepresentations and omissions contained in Aetna's press releases, Plaintiffs also allege that Defendants violated Section 10(b) and Rule 10b–5 based on violations of generally accepted accounting practices ("GAAP").[14] Plaintiffs allege that Aetna's financial statements for the first and second quarters of 1997 were overstated and that Defendants misrepresented that the quarterly financial statements had been prepared in accordance with GAAP. In particular, Plaintiffs allege that Aetna understated its Medical Claims Payable and set inadequate Medical Claims Reserves. Defendants move to dismiss allegations on the grounds that the GAAP allegations, as well as the reserve allegations, fail to state a securities fraud claim.

■ The Court finds that Plaintiffs have stated a claim based on the alleged GAAP violations. If the elements of a securities fraud claim are adequately pled, allegations that defendants reported false profits in violation of GAAP can state a claim under Rule 10b–5. *In Re Westinghouse Securities Litig.*, 90 F.3d at 708–10. As the Third Circuit has explained, "where plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data." *In re Burlington Coat Factory Securities Litig.*, 114 F.3d at 1417–18. In their Amended Complaint, Plaintiffs have stated what the alleged unreasonable accounting practices were and how Defendants allegedly distorted their earnings by reporting reduced Medical Claims Reserves, which allowed Aetna to report lower Medical Claims expenses. As such, they have stated a claim for securities fraud based on alleged violations of GAAP against Defendants Aetna, Compton, and Huber.[15]

Defendants also contend that the allegations concerning the setting of inadequate reserves are insufficient because Plaintiffs fail to allege facts indicating that Aetna knew that the reserves were inadequate at the time they were set. It is not a violation of the securities laws simply to fail to provide adequate loan loss reserves. *Shapiro v. UJB Financial Corp.*, 964 F.2d at 283. Here,

---

**14.** As the Third Circuit has explained, "GAAP is not a set of rigid rules ensuring identical treatment of identical transactions, but rather characterizes the range of reasonable alternatives that management can use. GAAP [is] an amalgam of statements issued by the [American Institute of Certified Public Accountants] through the successive groups it has established to promulgate accounting principles.... GAAP include[s] broad statements of accounting principles amounting to aspirational norms as well as more specific guidelines and illustrations." *In re Burlington Coat Factory Securities Litig.*, 114 F.3d at 1421 n. 10 (citations and quotation omitted).

**15.** Plaintiffs allegations against Defendant Abramson with respect to the alleged accounting fraud are inadequate for the same reasons that the allegations against him with respect to the statements in the press releases were inadequate.

however, Plaintiffs have not merely alleged that the reserves were inadequate. Rather, Plaintiffs have alleged that Aetna understated its Medical Claims Payable and did not provide adequate Medical Claims Reserves in order to bolster the earnings per share of Aetna stock. (Am.Compl. at ¶¶ 102–115.) Plaintiffs' Amended Complaint sets forth specific facts concerning the understatement of Aetna's Medical Claims Payable and the inadequacy of its Medical Claims Reserves, which were either known or recklessly disregarded by Defendants at the time that Defendants issued Aetna's earnings reports and financial statements for the first and second quarters of 1997. The Court finds that Plaintiffs' allegations in this regard are adequate to state a claim against Defendants Aetna, Compton, and Huber. *See In re Wells Fargo Securities Litig.*, 12 F.3d 922, 926–28 (9th Cir.1993).

### 5. *Analysts' Statements*

Defendants argue that Plaintiffs have failed to plead sufficient facts attributing analysts' statements about Aetna to Defendants. Plaintiffs, however, "do not allege that liability arises from the analysts' statements because defendants endorsed or adopted them prior to publication." (Pls.' Opp. at 64.) Rather, Plaintiffs included these statements merely for illustrative purposes. (*Id.*) Therefore, this aspect of Defendants' Motion is moot.

### C. *Section 20(a)*

Section 20(a) of the Exchange Act imposes joint and several liability on any person who controls a person liable under any provision of the Exchange Act. 15 U.S.C. § 78t(a). Plaintiffs allege that Defendants Compton, Huber and Abramson "acted as controlling persons of Aetna" under Section 20(a). (Am.Compl. at ¶ 132.) Section 20(a) requires proof that "one person controlled another person, but also that the 'controlled person' is liable under the Act." *Shapiro v. UJB Financial Corp.*, 964 F.2d at 279. Defendants have moved for dismissal of this claim on the grounds that there cannot be liability under Section 20(a) against Defendants Compton, Huber, and Abramson where Plaintiffs have failed to state a claim under Section 10(b) against Aetna, the "controlled person."

Defendants' argument is based on their assumption that the Court would dismiss Plaintiffs' Section 10(b) claim against Aetna. The Court has declined to do so. Moreover, with respect to Defendants Compton and Huber, the Court finds that Plaintiffs have adequately pled that these Defendants influenced and controlled the decision making of Aetna. Therefore, Plaintiffs have stated a claim against Defendants Compton and Huber under Section 20(a).

The Court reaches a different result with respect to Defendant Abramson. Because Plaintiffs have failed to adequately allege that Defendant Abramson controlled Aetna, within the meaning of Section 20(a), the Court will dismiss Plaintiffs' Section 20(a) claim against Defendant Abramson.

### D. *Section 20A(a)*

Plaintiffs bring claims against Defendants Abramson and Compton for insider trading, pursuant to Section 20A(a) of the Exchange Act. 15 U.S.C. § 78t–1(a). "A Section 20A claim is dependent upon a violation of the '34 act." *Rosenbaum & Co. v. H.J. Myers, Inc. Co.*, Civ.A. No. 97–824, 1997 WL 689288, at *2 (E.D.Pa. Oct.9, 1997). In the absence of an independent violation of the Exchange Act, a defendant cannot be liable under Section 20A. *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994). Because Plaintiffs' 10b–5 claim against Defendant Abramson fails, their Section 20A claim against him fails as well. The Court will dismiss Plaintiffs' Third Claim against Defendant Abramson. Plaintiffs, however, have stated a Section 20A claim against Defendant Compton. Consequently, the Court will not dismiss Plaintiffs' Fourth Claim against Defendant Compton.

### IV. *CONCLUSION*

In summary, the Court finds that Plaintiffs' information and belief allegations are inadequately pled and that the Section 10(b) claim against Defendants Aetna, Compton, and Huber cannot be based on the July 25, 1997 press release. In addition, the Court

finds that Plaintiffs have failed to state claims against Defendant Abramson under Sections 10(b), 20(a), and 20A(a). Therefore, the Court will dismiss Plaintiffs' Amended Complaint. The Court will grant Plaintiffs' request to replead.

An appropriate Order follows.

### ORDER (No. 7)

AND NOW, this 2nd day of February, 1999, upon consideration of the Motion to Dismiss filed by Defendants Aetna, Compton, and Huber (Doc. No. 14), the Motion to Dismiss filed by Defendant Abramson (Doc. No. 15), the Opposition filed by Plaintiffs (Doc. No. 16), the Replies filed by Defendants (Doc. Nos. 18 and 19), and the legislative history filed jointly by the parties (Doc. No. 21), **IT IS HEREBY ORDERED** that

1. The Motion to Dismiss filed by Defendants Aetna, Compton, and Huber is **GRANTED IN PART AND DENIED IN PART;**

2. The Motion to Dismiss filed by Defendant Abramson is **GRANTED;**

3. Plaintiffs' request for leave to replead is **GRANTED.** Plaintiffs may file an amended complaint within twenty (20) days of the date of this order.