78 F.Supp.2d 976 (1999)
In re BANKAMERICA CORP. SECURITIES LITIGATION.
MDL No. 1264.
United States District Court, E.D. Missouri, Eastern Division.
December 15, 1999.
*977 *978 *979 *980 *981 *982 Martin M. Green, Joe D. Jacobson, Green and Schaff, St. Louis, MO, Daniel S. Peters, St. Louis, MO, Arthur N. Abbey, James S. Notis, Abbey and Gardy, New York, NY, Christi C. Mobley, Martin D. Chitwood, Chitwood and Harley, Atlanta, GA, Jules Brody, Stull and Stull, New York, NY, Andrew J. Entwistle, Vincent R. Cappucci, Entwistle and Cappucci, New York, NY, Clint Krislov, Krislov and Associates, Ltd., Chicago, IL, Robert J. Stein, III, Chicago, IL, Donald H. Clooney, St. Louis, MO, and Daniel W. Krasner, New York, NY, for plaintiff.
Warren Stern, Marc Wolinsky, Wachtell and Lipton, New York, NY, John Michael Clear, Bryan Cave LLP, St. Louis, MO, Diane E. Pritchard, San Francisco, CA, for defendant.

ORDER
NANGLE, District Judge.
Before the Court is defendants' motion to dismiss plaintiffs' first consolidated and amended class action complaint. For the reasons that follow, defendants' motion is granted in part and denied in part.

I. BACKGROUND

NationsBank Corp. (NB), a North Carolina corporation,[1] and old BankAmerica (OBA), a Delaware corporation, signed a merger agreement on April 10, 1998, under which OBA would merge with NB in a stock-for-stock transaction. First Consolidated & Am. Class Action Compl. (hereinafter "Compl.") at 16 (Doc. 17). NB shareholders would receive one share of stock in the merged entity, the new BankAmerica Corp. (NBA), for each share of NB stock they owned. Id. OBA shareholders would receive 1.1316 shares of NBA stock for each share of OBA stock owned. Id. at 17. This exchange rate was based on the relative prices of the two banks at the close of business on April 9, 1998. Id. As a result of these exchanges, former NB shareholders would own approximately 54 percent of NBA, and former OBA shareholders would own approximately 46 percent. Id.
On August 4, 1998, NB filed a Form S-4 Registration Statement with the Securities and Exchange Commission (SEC) to register the common stock to be issued in the merger. Id. The Registration Statement included a Joint Proxy/Prospectus issued by both banks to solicit shareholder approval of the merger. Id. The Proxy/Prospectus described the merger as a "merger of equals" in which no premium would be paid to either side. Id. at 27. The term *983 "merger of equals" was explained as shared control of the combined entity by shareholders of both banks. Id. In support of this contention, the Proxy/Prospectus stated that the Board of Directors of the combined entity would contain 11 directors from NB and 9 from OBA. Id. at 28. Further, the document stated that Hugh L. McColl, Jr., then Chairman and Chief Executive Officer of NB, would be Chairman and CEO of NBA, and that David M. Coulter, then CEO of OBA, would become President of the combined bank. Id. Additionally, the Proxy/Prospectus represented that it was the "present intention" of defendants that Coulter would succeed McColl as Chairman and CEO of NBA. Id.
The Proxy/Prospectus incorporated by reference OBA's 1997 Annual Report on Form 10-K and the 1997 Annual Report distributed to shareholders. Id. at 26. The Report described the fact that OBA "established a relationship" with D.E. Shaw & Co. (Shaw) in 1997. Id. The 1997 Annual Report to Shareholders characterized this relationship as one which would enhance OBA's ability to offer additional financial products to its customers. Id. The Report also discussed certain risks associated with OBA's businesses, including the risk of adverse international developments and changes in interest rates, foreign currency rates, and prices of equity securities. Mem. Supp. Defs.' Mot. Dismiss at 4-5.
Shaw was founded in 1988 with a plan to use computer mathematical models to take advantage of market inefficiencies in the pricing of various securities. Compl. at 18. The company would calculate the variances between the model-determined price of a security and the market-determined price. If the model price was lower than the market price, Shaw would sell the security and wait to buy it at a lower price in the future. If the model price was higher than the market price, Shaw would buy the security and wait to sell it a higher price in the future. Id. at 18-19. By leveraging[2] its available equity, Shaw was able to obtain and control vast trading positions. By buying or selling in bulk, Shaw was able to capitalize on small variances in the price of securities. Id. at 19.
On March 13, 1997, OBA issued a press release to announce a "strategic relationship" with Shaw which would focus on providing OBA customers with an expanded range of financial products. Id. The release also stated that the agreement between OBA and Shaw was a financing relationship that did not result in any ownership interest by either firm in the other. Id. In subsequent press releases and reports, OBA continued to describe the relationship exclusively in terms of providing its customers with access to a broader range of financial products and services. Id. at 20 (describing April 16, 1997 press release, Quarterly Report on Form 10-Q filed May 15, 1997, 1997 Annual Report to Shareholders, and Annual Proxy filed March 23, 1998, which all characterized the Shaw relationship as one which would enhance OBA's ability to offer equity-related products to its customers).
The relationship involved a $1.4 billion unsecured loan from OBA to Shaw, which Shaw would manage as a separate trading portfolio. Fifty percent of any resulting profits would be returned to OBA. Shaw ultimately leveraged the $1.4 billion to support a bond portfolio valued at $20 billion. Id. at 21.[3] OBA allegedly monitored Shaw's management of the $1.4 billion and the trading positions of Shaw during the course of the relationship through internal reports and other means. Id. at 21-22, 23-24. The extent of this monitoring is disputed by the parties.
*984 In the summer of 1998, Shaw's trading strategy involved selling borrowed United States Treasury bonds and buying riskier bonds, apparently including bonds in foreign corporations, in an effort to profit when and if the price gap between the two financial instruments narrowed. The U.S. Treasuries would be replaced when prices fell. Id. at 22.[4] However, the price gap did not narrow. Rather, it widened due in part to Russia's default on its debt on August 17, 1998. Id. 22-23; Mem. Supp. Defs.' Mot. Dismiss at 5. In an increasingly downward spiral, the hedge funds with the most highly leveraged portfolios fell first, which caused the price gap between riskier bonds and U.S. Treasuries to increase even more. As a result, the losses experienced by the remaining funds increased. Compl. at 23.
The crisis forced many financial institutions to declare losses in their foreign securities portfolios. Mem. Supp. Defs.' Mot. Dismiss at 5. OBA made its announcement on August 28, 1998, indicating $220 million in trading losses primarily in the Russian Federation and stating that OBA had reduced its total Russian Federation exposure from $421 million at June 30 to approximately $100 million at August 26. Id.; Compl. at 30. On September 15, 1998, OBA issued another press release reporting an additional $110 million in trading losses, but that the bank still expected to report an after-tax profit excluding merger-related charges of $500 million for the third quarter of 1998. The press release also stated that the market conditions remained volatile and that these projections were subject to change. Compl. at 30; Mem. Supp. Defs.' Mot. Dismiss at 5-6.
On September 15, 1998, NB issued a press release reiterating its support for the merger despite OBA's losses. The merger was approved by the shareholders of both banks at special meetings held on September 24, 1998. Compl. at 30. The merger was completed on September 30, 1998. Id. On October 1, 1998, defendants held a press conference to discuss the completion of the merger. During this conference, McColl, Chairman and CEO of NBA, stated that NBA had outstanding loans to hedge funds in an amount "below $300 million" and that the company had an "investment" in Shaw. Id. at 31. The statement also allegedly falsely represented that all of such loans were secured. Id.
On October 14, 1998, NBA stated in its Third Quarter Earnings Release that it was forced to take a $372 million charge-off of the Shaw loan and to reverse $70 million in income related thereto. Id. at 33. Additionally, the company revealed that its investment in the relationship was $1 billion after the charge-off. Id.; Mem. Supp. Mot. Dismiss at 7. In order to protect this investment, NBA was forced to purchase Shaw's $20 billion fixed-income securities portfolio in order to avoid an additional $175 million in losses that would flow from the liquidation of those securities. Compl. at 33. The company also disclosed the existence of approximately $400 million in other hedge fund exposure which was substantially collateralized. Id.; Defs.' Mot. Dismiss, Ex. H, at 5. As a result, NBA's stock price fell $5-15/16 per share on October 14, 1998. Compl. at 33.
On October 16, 1998, The Wall Street Journal reported an interview with James Hance, NBA's Chief Financial Officer. The article stated that "BankAmerica *985 Corp. knew as early as August about losses at its high-risk trading operation with D.E. Shaw & Co. but decided not to disclose the problem until this week because it feared the publicity could cause the bank to lose its entire $1.4 billion loan to the fund." Rick Brooks & Mitchell Pacelle, BankAmerica Knew in August of Trading Woes, Wall St. J., Oct. 16, 1998, at A3. The article also reported that Hance stated that he and McColl, along with other top executives, had been scrambling since late September to deal with the Shaw situation. Id. Further, Mr. McColl was aware that the operation was not doing well as early as August. Id. at A10. Additionally, the article reported that "[t]hrough it all, BankAmerica was receiving daily reports on the positions and the losses at the trading venture." Id. Hance also indicated that "he ha[d] been monitoring the situation on a daily basis." Id. Although the reporters questioned Hance about the appropriateness of this transaction and whether material information was withheld, Hance defended the decision and stated that defendants did not decide to take the write-down until the night before the announcement was made. Id. at A3. In reaction to the report of losses, many analysts lowered their ratings for NBA common stock. Compl. at 34. Further, several analysts questioned the failure to disclose the Shaw investment, often commenting that the size of the loan was irresponsibly or unusually large. Id. at 34-35.
On October 20, 1998, Coulter, President of NBA and heir apparent to McColl, announced his resignation. Id. at 35. The Wall Street Journal reported on October 23, 1998 that an unidentified director of NBA declared that the merger was never intended to be a merger of equals. Id. at 36. Additionally, unidentified former OBA officials told the Journal that speculation grew during July and August that Coulter would never succeed McColl. Many associated with OBA started to view the merger as a takeover. Id. Further, McColl was allegedly giving Coulter "the cold shoulder" at the time the merger was completed, excluding him from the announcement festivities on October 1, 1998. Id. at 36-37. Others viewed this as a result of the Shaw situation. Mem. Supp. Mot. Dismiss at 8.
Coulter received a generous severance package upon his departure from NBA. Compl. at 37. After the resignation, further appointments of members of the former NB camp to high-ranking positions within NBA caused the press to state that the former NB was firmly in control of a bank originally billed as a merger of equals. Id. at 37-38.
Shareholders from both banks filed multiple class action securities fraud suits as a result of the Shaw disclosures and the Coulter resignation. The Judicial Panel on Multi-District Litigation consolidated the thirteen securities fraud class action suits filed in federal court as a result of the troubles at NBA and transferred them to this District. (Doc. 1, Doc. 11). In plaintiffs' First Consolidated and Amended Complaint, the plaintiffs are divided into 4 subclasses: NB Holders, BA Holders, NB Purchasers, and BA Purchasers. Compl. at 3-4. The complaint raises 13 counts[5] against four different groups of defendants: NBA  the combined corporation, the Insider Defendants, the Registration Defendants, and the OBA Director Defendants. A breakdown of these last three groups is attached hereto as Exhibit A.
Count I, a false or misleading proxy claim brought by the NB Holders against NBA and the Insider Defendants, alleges violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, for failure to disclose the extent of the Shaw relationship and losses in the Proxy/Prospectus. Count II, a control person count brought by the NB Holders against the Insider Defendants, alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for the Insiders' *986 control over NB, a primary violator of the Act. Count III, a state law breach of fiduciary duty claim brought by the NB Holders against the Registration Defendants, alleges violations of the duty to disclose by failing to disclose the Shaw information. Count IV, a fraud on the market claim brought by the NB Purchasers against NBA and the Insider Defendants, alleges violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, for failure to disclose the Shaw information. Count V, a control person count brought by the NB Purchasers against the Insider Defendants, alleges violations of Section 20(a) of the Exchange Act for the Insiders' control over NB, a primary violator of the Act.
Count VI, a false registration statement claim brought by the BA Holders against NBA, the Insider and Registration Defendants, alleges violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, for the alleged fraudulent or misleading use of the term "merger of equals." Count VII, a false prospectus claim brought by the BA Holders against NBA, the Insider and Registration Defendants, alleges violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) for the alleged fraudulent or misleading use of the term "merger of equals." Count VIII, a control person count brought by the BA Holders against the Insider Defendants, alleges violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, for the Insiders' control over NB, a primary violator of the Act. Count IX, a false or misleading proxy statement claim by the BA Holders against NBA and the Insider Defendants, alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 for failure to disclose the Shaw information. Count X, a control person claim brought by the BA Holders against the Insider Defendants, alleges violations of Section 20(a) of the Exchange Act for the Insiders' control of OBA, a primary violator of the Act. Count XII, a state law breach of fiduciary duty claim brought by the BA Holders against the OBA Director Defendants, alleges violations of the duty to disclose by failing to disclose the Shaw information. Count XIII, a fraud on the market claim brought by BA Purchasers against NBA and the Insider Defendants, alleges violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 for failure to disclose the Shaw information. Count XIV, a control person count brought by BA Purchasers against the Insider Defendants, alleges violations of Section 20(a) of the Exchange Act for the Insiders' control over NBA or its predecessors, primary violators of the Act.

II. LEGAL STANDARDS

A. Federal Rule of Civil Procedure 12(b)(6)

When ruling on a Rule 12(b)(6) motion to dismiss, a court must examine the complaint in the light most favorable to the non-moving party, accept the well-pleaded factual allegations as true and construe all allegations in favor of the plaintiff. See Carney v. Houston, 33 F.3d 893, 894 (8th Cir.1994); Hamm v. Groose, 15 F.3d 110, 112 (8th Cir.1994); Kohl v. Casson, 5 F.3d 1141, 1148 (8th Cir.1993). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); See also Estate of Rosenberg by Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir.1995).

B. Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The purpose of Rule 9(b) is to
provide[] defendants with fair notice of the plaintiffs' claims, protect[] defendants from harm to their reputation and goodwill, reduce[] the number of strike *987 suits, and prevent[] plaintiffs from filing baseless claims and then attempting to discover unknown wrongs.
Zuckerman v. Foxmeyer Health Corp., 4 F.Supp.2d 618, 622 (N.D.Tex.1998) (quoting Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir.1994)). To satisfy this heightened pleading standard, plaintiffs must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." Zuckerman, 4 F.Supp.2d at 622 (quoting Williams v. WMX Technologies, Inc., 112 F.3d 175, 177 (5th Cir.1997)); In re NationsMart Corp. Securities Litig., 130 F.3d 309, 320-21 (8th Cir.1997) (requiring plaintiffs to demonstrate who made the allegedly fraudulent statement, when it was made, and why it is allegedly false and to plead specific facts showing how alleged fraudulent omissions were material); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 812 (2d Cir.1996) (requiring plaintiffs to allege how statements are false and must allege facts that give rise to a strong inference of fraudulent intent); In re Silicon Graphics, Inc. Secs. Litig., 970 F.Supp. 746, 752 (N.D.Cal.1997) (requiring plaintiffs to state precisely the time, place, and nature of the misleading statements, misrepresentations, and specific acts of fraud).
Additionally, plaintiffs must attribute all misleading statements to particular defendants, in order to enlighten each defendant as to his or her part in the alleged fraud. Zuckerman, 4 F.Supp.2d at 622; Silicon Graphics, 970 F.Supp. at 752; In re Health Management, Inc. Secs. Litig., 970 F.Supp. 192, 208 (E.D.N.Y.1997). This requirement can be met by the group publication doctrine, which involves a rebuttable presumption that individual officers or directors involved in the day-to-day affairs of the corporation are collectively responsible for fraudulent or misleading statements or omissions in group published documents such as registration statements, prospectuses, annual reports, and certain press releases. In re GlenFed, Inc. Secs. Litig., 60 F.3d 591, 593 (9th Cir.1995); In re Aetna, Inc. Secs. Litig., 34 F.Supp.2d 935, 949 (E.D.Pa.1999); Zuckerman, 4 F.Supp.2d at 622; Health Management, 970 F.Supp. at 208; In re Marion Merrell Dow, Inc. Secs. Litig., No. 92-0609-CV-W-6, 1993 WL 393810, at *5 (W.D.Mo. Oct.04, 1993). This presumption is not applicable to non-officer (i.e. outside) directors unless plaintiffs allege specific facts to show that these individuals had direct involvement in the day-to-day affairs of the corporation or that they were involved in preparing or communicating group information at particular times. The mere signing of the group published documents will not suffice to meet this burden. GlenFed, 60 F.3d at 593; Aetna, 34 F.Supp.2d at 949; Marion Merrell Dow, 1993 WL 393810, at *6.
Rule 9(b) does not apply to claims under §§ 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77l(a)(2), because those claims do not require proof of fraud for recovery. NationsMart, 130 F.3d at 315.[6] The Rule does, however, apply to claims pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a); and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9. NationsMart, 130 F.3d at 320 (applying Rule 9(b) to § 10(b) and Rule 10b-5 claims); Union of Needletrades, Indus. & Textile Employees v. May Dep't Stores Co., 26 F.Supp.2d 577, 583-84 (S.D.N.Y.1997) (holding that Rule 9(b) applies to § 14(a) and Rule 14a-9 claims); Maywalt v. Parker & Parsley Petroleum *988 Co., 808 F.Supp. 1037, 1055 (S.D.N.Y.1992) (same).

C. Private Securities Litigation Reform Act of 1995 (PSLRA)

The PSLRA, 15 U.S.C. § 78u-4(b), codifies a heightened pleading standard for fraud in securities class action lawsuits. The statute requires securities fraud plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Any allegations of fraud made on information and belief must state with particularity the facts on which the belief is based. Id. Further, for each allegedly fraudulent statement or omission, plaintiffs must set forth particular facts that give rise to a strong inference that the defendants acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). Any complaint failing to meet these requirements must be dismissed. 15 U.S.C. § 78u-4(b)(3)(A).
The PSLRA also has a safe harbor provision for forward-looking statements. A defendant is not liable for forward-looking statements if: (1) the forward-looking statement is identified as forward-looking and is accompanied by meaningful cautionary language; or (2) if the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 77z-2(c)(1)(B) (Securities Act); 15 U.S.C. § 78u-5(c)(1)(B) (Exchange Act). Forward-looking statements include predictions as to future revenues, income, dividends, capital structure or other financial items; statements of future economic performance; and statements of the future plans and objectives of management for future operations. 15 U.S.C. § 78u-5(i)(1).
There is some debate among the courts as to whether the group pleading doctrine survived the passage of the PSLRA. Cases holding that group pleading is no longer available hold that the doctrine is not consistent with the purposes of the PSLRA. Specifically, they state that because the PSLRA requires that the alleged misstatements or omissions be set forth with particularity as to each defendant and that scienter be pled with regard to each act or omission, the group pleading doctrine was overruled sub silentio by the Act. Marra v. Tel-Save Holdings, Inc., No. Master File 98-3145, 1999 WL 317103, at * 5 (E.D.Pa. May 18, 1999); Coates v. Heartland Wireless Communications, Inc., 26 F.Supp.2d 910, 915-16 (N.D.Tex. 1998); Allison v. Brooktree Corp., 999 F.Supp. 1342, 1350-51 (S.D.Cal.1998). However, the doctrine has nothing to do with scienter. Rather, it is a reasonable presumption that the contents of company-published documents and press releases are attributable to officers and directors with inside knowledge of and involvement in the day-to-day affairs of the company. Accordingly, because the group pleading doctrine is a rebuttable presumption applicable only to a limited group of persons within the company, the Court finds that the presumption is not inconsistent with the PSLRA. See Aetna, 34 F.Supp.2d at 948-49 (applying the doctrine to claims under the PSLRA); In re Miller Indus., Inc. Secs. Litig., 12 F.Supp.2d 1323, 1329 (N.D.Ga.1998) (same); In re Stratosphere Corp. Secs. Litig., 1 F.Supp.2d 1096, 1108 (D.Nev.1998) (holding that the PSLRA did not abolish the group pleading doctrine); Health Management, 970 F.Supp. at 208 (applying the doctrine to cases under the PSLRA).

D. Section 14(a) and Rule 14a-9

Section 14(a) of the Securities Exchange Act of 1934 prohibits the solicitation of any proxy in a manner which violates rules promulgated by the Securities and Exchange Commission (SEC). 15 U.S.C. § 78n(a). SEC Rule 14a-9 specifically prohibits solicitation of proxies by means of proxy statements which contain false or misleading statements concerning any material fact or omissions of material facts which make any part of the statement misleading. 17 C.F.R. § 240.14a-9. Plaintiffs can establish a violation of Section 14(a) and Rule 14a-9 by showing: (1) the proxy statement contains a material *989 misrepresentation or omission; (2) the defendants were negligent in drafting the statement; and (3) the proxy caused an injury to plaintiffs. Parsons v. Jefferson-Pilot Corp., 789 F.Supp. 697, 701 (M.D.N.C.1992). A misrepresentation or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Specifically with respect to omissions, an omission is material if disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. TSC Indus. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); Parsons, 789 F.Supp. at 701-02.
No showing of intent to deceive or recklessness is required under Section 14(a). Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1300-01 (2d Cir.1973). Plaintiffs need only show that the defendants negligently drafted the proxy statement. Shidler v. All Am. Life & Fin. Corp., 775 F.2d 917, 926-27 (8th Cir.1985); Gould v. American-Hawaiian Steamship Co., 535 F.2d 761, 777 (3d Cir.1976). "As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the Gerstle negligence standard." Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 995 (2d Cir.1988); Parsons, 789 F.Supp. at 703, Fradkin v. Ernst, 571 F.Supp. 829, 843 (N.D.Ohio 1983). Defendants request, without any authority, that this state of mind requirement be reconsidered in light of the PSLRA. Defs.'Reply Mem. Supp. Mot. Dismiss at 14, n.*. However, the text of the PSLRA merely requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This provision cannot reasonably be read as changing the substantive state of mind previously required. Accordingly, the Court declines to adopt a stricter state of mind requirement for Section 14(a) claims.
The test for determining causation in Section 14(a) and Rule 14a-9 claims was set forth by the Supreme Court in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).
Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if ... he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.
Id. In other words, when plaintiffs have established "that proxies necessary to approval of [the transaction] were obtained by means of a materially misleading solicitation," they have established causation as a matter of law. Id. at 386, 90 S.Ct. 616; General Elec. Co. v. Cathcart, 980 F.2d 927, 933 (3d Cir.1992); Parsons, 789 F.Supp. at 704; Fradkin, 571 F.Supp. at 842; see also Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1099-1102, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (holding that minority shareholders holding a number of proxies that were insufficient to change the outcome of the vote could not establish causation).

E. Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of any manipulative or deceptive device or contrivance in connection with the purchase or sale of any security. 15 U.S.C. § 78j. SEC Rule 10b-5 further prohibits the making of any untrue statement of a material fact or the omission of a material fact in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. To prevail on a Rule 10b-5 claim, plaintiffs must show that: (1) defendants acted in a manner prohibited by the rule (in this case made a misrepresentation or omission of material fact); (2) defendants acted with scienter; (3) plaintiffs relied on defendants' *990 misrepresentations or omissions to their detriment; and (4) the allegedly fraudulent conduct caused plaintiffs to purchase the securities and caused the plaintiffs' economic harm. NationsMart, 130 F.3d at 320; Arthur Young & Co. v. Reves, 937 F.2d 1310, 1327-28 (8th Cir.1991); Zuckerman, 4 F.Supp.2d at 621.
A misrepresentation or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir.1997) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). If a reasonable investor would not have been swayed by the information misrepresented or omitted, then the information is immaterial as a matter of law. Id. Information of common knowledge, insignificant data, or vague statements are examples of immaterial information. Id. at 546-47.
Reliance requires plaintiffs to show that the alleged misrepresentations or omissions induced them to act differently than they would otherwise have done in making investment decisions. NationsMart, 130 F.3d at 321. "In a case involving a failure to disclose information to investors, courts will presume reliance if the omitted information is shown to be material." Id. This presumption applies only to face-to-face transactions. Id. However, reliance may also be presumed under the fraud on the market theory, "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities." Id. (quoting Basic, Inc. v. Levinson, 485 U.S. at 247, 108 S.Ct. 978); Zuckerman, 4 F.Supp.2d at 621.
The first prong of the causation standard  that the allegedly fraudulent conduct caused plaintiffs to purchase the securities  is also satisfied by the fraud on the market presumption. Arthur Young, 937 F.2d at 1328-29. When defendants' alleged misconduct primarily involves a failure to disclose, this causation will be inferred if the withheld information was material. Id. The second prong of the causation standard  that the allegedly fraudulent conduct caused the plaintiffs' economic harm  can be satisfied by proving that some causal nexus between the conduct and the losses exists. Id. at 1332. The theory is very similar to proximate cause principles from tort law. Id. In this case, plaintiffs must prove that the drop in the stock price was somehow related to defendants' non-disclosures.
Scienter may be established from facts demonstrating "a mental state embracing intent to deceive, manipulate or defraud." Zuckerman, 4 F.Supp.2d at 622 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). The passage of the PSLRA has caused a split among the circuits as to what plaintiff must plead to prove scienter. See In re Silicon Graphics, Inc. Secs. Litig., 183 F.3d 970, 974-975 (9th Cir.1999) (discussing the different interpretations of scienter held by the various circuits). The Eighth Circuit has yet to address this question. Consequently, this Court must review the existing case law and determine which approach most closely fits with the intent of Congress in passing the PSLRA.
The Second and Third Circuits have adopted the pleading standard utilized by the Second Circuit pre-PSLRA. In re Advanta Corp. Secs. Litig., 180 F.3d 525, 534-35 (3d Cir.1999); Press v. Chemical Inv. Serv. Corp., 166 F.3d 529, 537-38 (2d Cir.1999). This standard allows plaintiffs to plead scienter by alleging facts establishing a motive and an opportunity to commit fraud or by setting forth facts that constitute circumstantial evidence of either reckless or conscious misbehavior. Advanta, 180 F.3d at 534-35; Press, 166 F.3d at 537-38. "Motive would entail concrete benefits that could be realized by one or more of the statements and wrongful disclosures alleged. Opportunity would entail the means and likely prospect of achieving *991 concrete benefits by the means alleged." In re Aetna, Inc. Secs. Litig., 34 F.Supp.2d 935, 955 (E.D.Pa.1999) (quoting Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1130 (2d Cir.1994)). "Reckless conduct is, at the least, conduct which is `highly unreasonable' and which represents `an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Health Management, 970 F.Supp. at 202 (quoting Chill v. General Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996)).
The Sixth and Eleventh Circuits have adopted a heightened Second Circuit standard, rejecting the motive and opportunity prong but continuing to allow the pleading of facts that constitute recklessness or conscious misbehavior. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1283 (11th Cir.1999); In re Comshare, Inc. Secs. Litig., 183 F.3d 542, 549 (6th Cir.1999). The Ninth Circuit adopted the most stringent requirement, holding that plaintiffs must allege facts giving rise to a strong inference of deliberate recklessness. Silicon Graphics, 183 F.3d at 975.
Those Courts rejecting Second Circuit approach have relied on the legislative history of the PSLRA or have interpreted the "strong inference" requirement of the statute as prohibiting motive and opportunity pleading. Id. at 977-79 (relying on legislative history); Bryant, 187 F.3d at 1285-87. However, as the Third Circuit noted, the legislative history of the PSLRA is contradictory and inconclusive on the point of whether the statute was intended to reject the Second Circuit standard. Advanta, 180 F.3d at 533. Unlike the legislative history, the plain language of the statute makes it clear that no change in the substantive standard for scienter was intended. Comshare, 183 F.3d at 549-50; Advanta, 180 F.3d at 534; Zuckerman, 4 F.Supp.2d at 622-23. Further, the plain language of the PSLRA adopts the standard of scienter required by the Second Circuit pre-PSLRA. Advanta, 180 F.3d at 533-34 (stating that the PSLRA standard and the pre-PSLRA Second Circuit standard are virtually identical in wording); Coates v. Heartland Wireless Communications, Inc., 55 F.Supp.2d 628, 642 (N.D.Tex.1999) (adopting Second Circuit standard because Second Circuit is "widely acknowledge to have originated the PSLRA's `strong inference' standard"). In light of the text of the PSLRA itself, this Court agrees with other courts which have noted that if Congress intended to eliminate the Second Circuit's motive and opportunity test, it could have done so expressly in the text of the Act. Advanta, 180 F.3d at 534 n. 8; Aetna, 34 F.Supp.2d at 951-952; Health Management, 970 F.Supp. at 201. Accordingly, the Court holds that plaintiffs can establish scienter by alleging facts establishing a motive and an opportunity to commit fraud or by setting forth facts that constitute circumstantial evidence of either reckless or conscious misbehavior as those terms have been defined by the Second Circuit.

F. Sections 11 and 12(a)(2)

Section 11 of the Securities Act of 1933 prohibits false or misleading registration statements and provides that any signer of the statement, partner or director of the issuer, any professional involved in preparing or certifying the statement, and any underwriter of the statement may be liable. 15 U.S.C. § 77k. Section 12(a)(2) prohibits the offer or sale of a security pursuant to a false or misleading prospectus. 15 U.S.C. § 77l (a)(2). Both Sections require proof of "untrue or misleading statements or omissions of material fact." Schoenhaut v. American Sensors, Inc., 986 F.Supp. 785, 790 (S.D.N.Y.1997). Plaintiffs need only prove that they bought the security and that there was a material misstatement or omission in the registration statement or prospectus to satisfy the requirements of Sections 11 and 12(a)(2). NationsMart, 130 F.3d at 315, 318. Allegations of fraud or scienter are not required to establish liability under these Sections. Id.; Herman & MacLean v. Huddleston, 459 U.S. *992 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); Kaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir.1994).
A misrepresentation or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir.1997) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)); Schoenhaut, 986 F.Supp. at 790; Zucker v. Quasha, 891 F.Supp. 1010, 1014 (D.N.J.1995). If a reasonable investor would not have been swayed by the information misrepresented or omitted, then the information is immaterial as a matter of law. Parnes, 122 F.3d at 546. Information of common knowledge, insignificant data, or vague statements are examples of immaterial information. Id. at 546-47.
Additionally, to be actionable, the statement must be false or misleading when made. Kaplan, 49 F.3d at 1373. Accordingly, statements made after the effective date of the registration statement or prospectus cannot be the basis of a Section 11 or Section 12(a)(2) claim. Id. Furthermore, defendants cannot be held liable under these Sections for the omission of material information which was unknown to and not reasonably discoverable by the defendants. In re Keegan Management Co. Secs. Litig., 794 F.Supp. 939, 946 (N.D.Cal.1992).

G. Control Person (Sections 15 and 20(a))

Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, and Section 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t(a), impose joint and several liability on any person who controls a person or entity liable under any provision of the primary Act. These provisions require the pleading of facts which support a reasonable inference that defendants had the power to influence and direct the activities of the primary violator. Aetna, 34 F.Supp.2d at 957; Health Management, 970 F.Supp. at 205. Because defendants' only attack on plaintiffs' control person claims is that the primary violation has not been adequately alleged, Defs.' Mem. Supp. Mot. Dismiss at 9 n.*, if the Court decides not to dismiss the primary count, the control person count will remain in the case as well. Zuckerman, 4 F.Supp.2d at 627-28.

H. Delaware Breach of Fiduciary Duty

Delaware common law, which would apply to the BankAmerica Holders' state law claims, provides that directors of a Delaware corporation have "a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." Arnold v. Society for Savings Bancorp., Inc., 650 A.2d 1270, 1277 (Del.1994). Materiality is defined using the federal standard  that plaintiffs must prove that there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Id. (quoting TSC v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). This obligation attaches to proxy statements and any other disclosures in contemplation of stockholder action. Id.
The Delaware Code contains a provision that states that if a corporation has an exculpatory charter provision, directors cannot be liable for monetary damages for breaches of fiduciary duty. 8 Del. C. § 102(b)(7). This statute applies to fiduciary disclosure requirements. Arnold v. Society for Savings Bancorp, Inc., 650 A.2d at 1287. The statute does, however, contain an exception for breaches of the duty of loyalty and for acts or omissions not in good faith. 8 Del.Code § 102(b)(7). Consequently, plaintiffs can avoid the bar of § 102(b)(7) by pleading facts supporting an inference that defendants breached their duty of loyalty to the corporation or *993 knowingly or deliberately failed to disclose facts they knew were material. Arnold v. Society for Savings Bancorp, Inc., 650 A.2d at 1288.[7]

III. ANALYSIS

A. NationsBank Holders' Section 14(a) and 14a-9 Claims (Counts I and II)

The NB Holder plaintiffs allege that NBA and the Insider Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder by failing to disclose the magnitude of the Shaw investment and the extent of losses related thereto in the proxy statement. Those plaintiffs further allege that the Insider Defendants violated Section 20(a) of the Exchange Act by controlling NB, a primary violator of the Act. Compl. at 40-42. Defendants object that there was no duty to disclose the details of the financing relationship and that plaintiffs have not alleged that any of the information disclosed was inaccurate. Mem. Supp. Defs.' Mot. Dismiss at 10-11. Defendants also assert that these claims fail to comply with the pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b). Id. at 19-23.
Defendants assert that they had no duty to disclose the Shaw information, and therefore, their failure to speak was not fraudulent. In In re Canandaigua Secs. Litig., 944 F.Supp. 1202, 1208 (S.D.N.Y. 1996), the court stated that "[m]ere non-disclosure of information will not necessarily give rise to [securities fraud] liability even if the information was material; a plaintiff must also establish that the defendant had a duty to disclose." The court also noted that in the Second Circuit, a duty to disclose exists only where there is (1) insider trading, (2) a statute or regulation requiring disclosure, or (3) an inaccurate, incomplete, or misleading prior disclosure. Id. The basis for this finding is a 1980 Supreme Court case, Chiarella v. United States, 445 U.S. 222, 235-36, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), which held that an employee of a printer employed by a company could not be liable for failure to disclose material information because he had no duty to disclose that information. However, the Court also noted that if Chiarella had been a corporate insider, there would have been a duty to disclose based on the fiduciary relationship that exists between insiders and shareholders.
That the relationship between a corporate insider and the stockholders of his corporation gives rise to a disclosure obligation is not a novel twist of the law. At common law, misrepresentation made for the purpose of inducing reliance upon the false statement is fraudulent. But one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information "that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them."
Chiarella, 445 U.S. at 227, 100 S.Ct. 1108 (quoting Restatement (Second) of Torts § 551(2)(a) (1976)).
Based on the rationale of Chiarella, this Court finds the Second Circuit's duty to disclose standard to be too harsh. The Court finds that corporate insiders have a duty to disclose material information whenever failure to disclose that information would be to the detriment of the shareholders, the persons to whom the insiders owe a fiduciary duty.
In this case, the Shaw information was certainly material. The Shaw information would have been considered important to *994 the NB Holders in deciding how to vote on the merger. Because the failure to disclose that information caused the stock of OBA to be overvalued, the BA Holders received a better exchange rate under the terms of the merger than they should have, to the detriment of the NB Holders. Consequently, a reasonable NB shareholder would have viewed the omitted information as having significantly altered the "total mix" of information available. Mills v. Electric Auto-Lite Co., 396 U.S. at 384, 90 S.Ct. 616; TSC Indus., 426 U.S. at 449, 96 S.Ct. 2126; Parsons, 789 F.Supp. at 701-02. Accordingly, the omitted information was material.
Furthermore, the omitted information clearly caused plaintiffs' injury. The NB Holder plaintiffs have established "that proxies necessary to approval of [the merger] were obtained by means of a materially misleading solicitation." Consequently, they have established causation as a matter of law. Mills v. Electric Auto-Lite Co., 396 U.S. at 386, 90 S.Ct. 616; Cathcart, 980 F.2d at 933; Parsons, 789 F.Supp. at 704; Fradkin, 571 F.Supp. at 842; see also Virginia Bankshares, Inc., 501 U.S. at 1099-1102, 111 S.Ct. 2749 (holding that minority shareholders holding a number of proxies that were insufficient to change the outcome of the vote could not establish causation).
The final element of a Section 14(a) and Rule 14a-9 claim is that the corporate issuer negligently drafted the proxy statement. Plaintiffs allege that the proxy statement was knowingly drafted with material omissions which would more than comply with the negligence standard. Defendants claim that plaintiffs failed to meet the Federal Rule of Civil Procedure 9(b) and the PSLRA requirements for pleading knowledge on the part of the defendants. Rule 9(b) merely requires that knowledge be alleged generally. Lerch v. Citizens First Bancorp., Inc., 805 F.Supp. 1142, 1151-52 (D.N.J.1992); see also In re V-Mark Software, Inc. Secs. Litig., 928 F.Supp. 122, 125 (D.Mass.1996) (declining to apply Rule 9(b) to dismiss a claim where plaintiffs allegedly made conclusory allegations of knowledge on defendants' part).
The PSLRA strengthened this requirement somewhat by requiring that plaintiffs set forth particular facts that give rise to a strong inference that the defendants acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). Further, all allegations based on information and belief must state with particularity all facts on which those beliefs are based. 15 U.S.C. § 78u-4(b)(1); Coates v. Heartland Wireless Communications, 26 F.Supp.2d 910, 915 (N.D.Tex.1998). Defendants do not dispute that they knew of the extent of the investment in Shaw. However, they do dispute knowledge of Shaw's losses. Specifically, they assert that these losses were not actualized until the decision to take a write-down was officially made on October 13, 1998. Plaintiffs rely on the existence of internal reports from Shaw concerning the progress of OBA's portfolio, statements by James Hance, CFO of NBA, in The Wall Street Journal, and the group pleading doctrine to establish that defendants knew of the magnitude of the losses at Shaw at the time the Proxy Statement was disseminated, August 4, 1998.
The Second and Ninth Circuits require that when plaintiffs are relying on the existence of internal reports, the reports must be specifically identified, including identifying who prepared the report, the date it was prepared, how firm the figures contained in the reports were, and which defendant officers reviewed the reports. Yourish v. California Amplifier, 191 F.3d 983, 996-97 (9th Cir.1999); San Leandro Emergency Med. Group Profit Sharing Plan, 75 F.3d at 812-13. The purpose behind this is to prevent specious allegations on the basis of the existence of unspecified reports, documents prepared by every company in the course of business. Plaintiffs allege the existence of a special booklet prepared by Shaw for OBA senior executives which was supplemented through the summer of 1998, the regular *995 occurrence of meetings between OBA Risk Management officials and Max Stone, the head of Shaw's Proprietary Fixed Income Desk, which was responsible for managing the OBA portfolio, the existence of risk reports and profit and loss reports on a daily basis prepared by Shaw's Technology Group, and the fact that NB officials scrutinized the Shaw relationship during the pre-merger due diligence work. Compl. at 21-22. Though these allegations are not as specific as the Second and Ninth Circuit standards require, they are enough, in combination with the admissions by James Hance in The Wall Street Journal to raise a strong inference that NB and OBA officials knew of the problems with Shaw in August of 1998. Rick Brooks & Mitchell Pacelle, BankAmerica Knew in August of Trading Woes, Wall St. J., Oct. 16, 1998, at A3, A10 (stating that James Hance admitted that OBA knew as early as August of trading losses at Shaw but decided not to disclose the problem until October because of fear that disclosure would cause the loss of the entire $1.4 billion investment and that Hugh McColl, CEO of NB, was also aware of the problems in early August). The group pleading doctrine, which this Court held in Part I.D., supra, survived the PSLRA, attributes knowledge of this information to all officers and directors with inside information of or involvement in the day-to-day affairs of the corporation. Consequently, plaintiffs have sufficiently pled that the Insider Defendants knowingly omitted the Shaw information from the Proxy Statement in violation of Section 14(a) and Rule 14a-9. Accordingly, the Court denies defendants' motion to dismiss Count I.
Plaintiffs have not sufficiently pled all the requirements to establish control person liability, however. Plaintiffs assert this claim against all Insider Defendants, including John J. Higgins, the Chief Accounting Officer of OBA prior to the merger. He is not, and never has been, an officer of NBA. Plaintiffs assert that the Insider Defendants controlled NB, a primary violator of the Act. However, plaintiffs have not established that Higgins had any control over NB at any time. Consequently, the Court dismisses Count II as to Higgins with leave to replead. The Insider Defendants also include David A. Coulter, CEO of OBA and President, albeit briefly, of NBA and Michael E. O'Neill, Chief Financial Officer of OBA and a president within NBA. Plaintiffs have not established that Coulter or O'Neill had control over NB at any time. Consequently, the Court dismisses Count II as to Coulter and O'Neill with leave to replead.[8]

B. BankAmerica Holders' Section 14(a) and 14a-9 Claims (Count IX and X)

The BA Holder plaintiffs allege that NBA and the Insider Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder by failing to disclose the magnitude of the Shaw investment and the extent of losses related thereto in the proxy statement, and that the Insider Defendants violated Section 20(a) of the Exchange Act by controlling OBA, a primary violator of the Act. Compl. at 49-51. Defendants object that there was no duty to disclose the details of the financing relationship and that plaintiffs have not alleged that any of the information disclosed was inaccurate. Mem. Supp. Defs.' Mot. Dismiss at 10-11. Defendants also assert that these claims fail to comply with the pleading requirements of the PSLRA. Id. at 19-23.
Even accepting all well-pleaded allegations in the complaint as true, the BA Holders cannot establish a violation of Section 14(a) or 14a-9 because they cannot establish causation. The Shaw account and subsequent losses belonged to OBA. The failure to disclose this information in the proxy solicitation actually helped the BA Holders by causing OBA stock to be *996 overvalued. That is, the OBA shareholders received a better exchange rate in the merger because the market price of OBA securities did not reflect the existence and extent of the losses at Shaw. Thus, they experienced no economic loss as a result of the failure to disclose the Shaw information in the proxy statement. Further, the BA Holders have not and cannot establish that they would have voted their shares differently if the Shaw information had been disclosed. On the contrary, disclosure of the Shaw information would have made the BA Holders more likely to vote for the merger because of the fact that their stock was overvalued in the transaction. Because no primary violation has been established, the Insider Defendants cannot be liable under Section 20(a). Accordingly, the Court holds that Counts IX and X should be dismissed with prejudice for failure to state a claim.

C. NationsBank Purchasers' Section 10(b) and 10b-5 Claims (Counts IV and V)

The NB Purchaser plaintiffs allege that NBA and the Insider Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by failing to disclose the magnitude of the Shaw investment and the extent of losses related thereto in any reports to shareholders, public filings with the SEC, and press releases made during the pendency of the merger, and that the Insider Defendants violated Section 20(a) of the Exchange Act by controlling NB, a primary violator of the Act. Compl. at 43-45. Defendants object that the anticipation of Shaw losses was not material because it was soft information, a mere projection and not an existing fact, and that the loan was small in relation to the bank's assets. Because plaintiffs failed to allege that defendants knew before quarter's end that losses would result, defendants contend that no statements made by the company were false or misleading due to the failure to inform about Shaw. Additionally, defendants assert that the risks of the bank's businesses (particularly as related to market volatility) were adequately disclosed, were of common knowledge, and were made with sufficient cautionary statements. Mem. Supp. Defs.' Mot. Dismiss at 11-18. Defendants also assert that these claims fail to comply with the pleading requirements of the PSLRA. Id. at 19-23.
To establish a Section 10(b) and Rule 10b-5 claim, plaintiffs must prove materiality, scienter, reliance and causation. In this case, the Shaw information was certainly material. The Shaw information would have been considered important to the NB Purchasers in deciding whether or not to buy NB stock. Had they known that NB was planning to merge with a bank with a large, risky investment in a highly leveraged hedge fund, the NB purchasers may very well have decided not to buy the stock. The losses at Shaw would be absorbed by the combined entity, including former NB purchasers. Consequently, a reasonable NB shareholder would have viewed the omitted information as having significantly altered the "total mix" of information available. Mills v. Electric Auto-Lite Co., 396 U.S. at 384, 90 S.Ct. 616; TSC Indus., 426 U.S. at 449, 96 S.Ct. 2126; Parnes, 122 F.3d at 546-47; Parsons, 789 F.Supp. at 701-02. Accordingly, the omitted information was material.[9]
Defendants also assert that the Shaw information was not material because it was a mere projection or soft information rather than a pre-existing hard fact. As will be discussed below, plaintiffs adequately pled that defendants knew as early *997 as August that Shaw was experiencing losses. Accordingly, the Court finds that the Shaw information was not a mere projection but was a material pre-existing fact that defendants should have disclosed to the market.[10]
Reliance and the first prong of causation are satisfied with the fraud on the market doctrine, which plaintiffs have adequately pled. Arthur Young & Co., 937 F.2d at 1328; Zuckerman, 4 F.Supp.2d at 621. Furthermore, the omitted information clearly satisfies the second prong of causation in that there is some nexus between the failure to disclose the Shaw information and the subsequent drop in the stock price. The NB Purchaser plaintiffs have established that failure to disclose the Shaw information caused them to purchase the securities and ultimately caused them economic harm when the value of the exchanged securities decreased after the Shaw announcement. Consequently, they have established causation as a matter of law.
The final element of a Section 10(b) and Rule 10b-5 claim is scienter, that the defendants had motive and opportunity to commit fraud or engaged in reckless or conscious misconduct. Plaintiffs allege that defendants committed conscious misconduct by transmitting the Proxy/Prospectus, the Registration Statement, various Annual Reports, and various press releases to the market when they knew that material information was omitted therefrom. Defendants claim that plaintiffs failed to meet the Federal Rule of Civil Procedure 9(b) and the PSLRA requirements for pleading knowledge on the part of the defendants. As found in Part III.A., supra, plaintiffs' allegations of the existence of internal reports are enough, in combination with the admissions by James Hance in The Wall Street Journal, to raise a strong inference that NB and OBA officials knew of the problems with Shaw in August of 1998. Rick Brooks & Mitchell Pacelle, BankAmerica Knew in August of Trading Woes, Wall St. J., Oct. 16, 1998, at A3, A10 (stating that James Hance admitted that OBA knew as early as August of trading losses at Shaw but decided not to disclose the problem until October because of fear that disclosure would cause the loss of the entire $1.4 billion investment and that Hugh McColl, CEO of NB, was also aware of the problems in early August). The group pleading doctrine, which this Court held in Part II.D., supra, survived the PSLRA, attributes knowledge of this information to all officers and directors with inside information of or involvement in the day-to-day affairs of the corporation. Consequently, plaintiffs have sufficiently pled that defendants knowingly omitted the Shaw information from their public documents and statements in violation of Section 10(b) and Rule 10b-5. Accordingly, the Court denies defendants' motion to dismiss Count IV.
Similarly to Count II, supra, plaintiffs have not sufficiently pled all the requirements to establish control person liability. Plaintiffs assert this claim against all Insider Defendants, including John J. Higgins, David A. Coulter, and Michael E. O'Neill. These men have never been officers of NB. Plaintiffs assert that the Insider Defendants controlled NB, a primary violator of the Act. However, plaintiffs have not established that Higgins, Coulter, and O'Neill had any control over NB at any time. Consequently, the Court dismisses Count V as to these three with leave to replead.[11]

*998 D. BankAmerica Purchasers' Section 10(b) and 10b-5 Claims (Counts XIII and XIV)

The BA Purchaser plaintiffs allege that NBA and the Insider Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by failing to disclose the magnitude of the Shaw investment and the extent of losses related thereto in any reports to shareholders, public filings with the SEC, and press releases made during the pendency of the merger, and that the Insider Defendants violated Section 20(a) of the Exchange Act by controlling NBA or its predecessors, primary violators of the Act. Compl. at 52-54. Defendants object that the anticipation of Shaw losses was not material because it was soft information, a mere projection and not an existing fact, and that the loan was small in relation to the bank's assets. Because plaintiffs failed to allege that defendants knew before quarter's end that losses would result, defendants contend that no statements made by the company were false or misleading due to the failure to inform about Shaw. Additionally, defendants assert that the risks of the bank's businesses (particularly as related to market volatility) were adequately disclosed, were of common knowledge, and were made with sufficient cautionary statements. Mem. Supp. Defs.' Mot. Dismiss at 11-18. Defendants also assert that these claims fail to comply with the pleading requirements of the PSLRA. Id. at 19-23.
As the Court explained earlier, in order to establish a Section 10(b) and Rule 10b-5 claim, plaintiffs must prove materiality, scienter, reliance and causation. In this case, the Shaw information was certainly material. The Shaw information would have been considered important to the BA Purchasers in deciding whether or not to buy OBA or NBA stock. Had they known of the existence of a large, risky investment in a highly leveraged hedge fund, the BA purchasers may very well have decided not to buy the stock. The losses at Shaw would be absorbed by NBA, including former OBA purchasers. Consequently, a reasonable NBA shareholder would have viewed the omitted information as having significantly altered the "total mix" of information available. Mills v. Electric Auto-Lite Co., 396 U.S. at 384, 90 S.Ct. 616; TSC Indus., 426 U.S. at 449, 96 S.Ct. 2126; Parnes, 122 F.3d at 546-47; Parsons, 789 F.Supp. at 701-02. Accordingly, the omitted information was material.[12]
Defendants also assert that the Shaw information was not material because it was a mere projection or soft information rather than a pre-existing hard fact. As will be discussed below, plaintiffs adequately pled that defendants knew as early as August that Shaw was experiencing losses. Accordingly, the Court finds that the Shaw information was not a mere projection but was a material pre-existing fact that defendants should have disclosed to the market.[13]
Reliance and the first prong of causation are satisfied with the fraud on the market doctrine, which plaintiffs have adequately pled. Arthur Young & Co., 937 F.2d at 1328; Zuckerman, 4 F.Supp.2d at 621. Furthermore, the omitted information clearly satisfies the second prong of causation in that there is some nexus between the failure to disclose the Shaw information and the subsequent drop in the stock price. The BA Purchaser plaintiffs have established that failure to disclose the Shaw information caused them to purchase the securities and ultimately caused them economic harm when the value of the exchanged securities decreased after the Shaw announcement. Consequently, they *999 have established causation as a matter of law.
The final element of a Section 10(b) and Rule 10b-5 claim is scienter, that the defendants had motive and opportunity to commit fraud or engaged in reckless or conscious misconduct. Plaintiffs allege that defendants committed conscious misconduct by transmitting the Proxy/Prospectus, the Registration Statement, various Annual Reports, and various press releases to the market when they knew that material information was omitted therefrom. Defendants claim that plaintiffs failed to meet the Federal Rule of Civil Procedure 9(b) and the PSLRA requirements for pleading knowledge on the part of the defendants. As found in Part III.A., supra, plaintiffs' allegations of the existence of internal reports are enough, in combination with the admissions by James Hance in The Wall Street Journal, to raise a strong inference that NB and OBA officials knew of the problems with Shaw in August of 1998. Rick Brooks & Mitchell Pacelle, Bank America Knew in August of Trading Woes, Wall St. J., Oct. 16, 1998, at A3, A10 (stating that James Hance admitted that OBA knew as early as August of trading losses at Shaw but decided not to disclose the problem until October because of fear that disclosure would cause the loss of the entire $1.4 billion investment and that Hugh McColl, CEO of NB, and other top NBA executives were also aware of the problems in early August). The group pleading doctrine, which this Court held in Part II.D., supra, survived the PSLRA, attributes knowledge of this information to all officers and directors with inside information of or involvement in the day-to-day affairs of the corporation. Consequently, plaintiffs have sufficiently pled that defendants knowingly omitted the Shaw information from their public documents and statements in violation of Section 10(b) and Rule 10b-5. Accordingly, the Court denies defendants' motion to dismiss Count XIII.
With respect to Count XIV, plaintiffs have adequately pled control person liability. Plaintiffs assert this claim against all Insider Defendants, alleging that they controlled NBA or its predecessor entities. Because the Insiders are all officers of either NB, OBA, or NBA, they had control of NBA or its predecessors. Accordingly, the Court denies defendants' motion to dismiss Count XIV.

E. Bank-America Holders' Section 11 and 12(a)(2) Claims (Counts VI, VII and VIII)

The BA Holder plaintiffs allege that NBA, the Insider Defendants and the Registration Defendants violated Sections 11 and 12(a)(2) of the Securities Act by falsely characterizing the merger as a merger of equals in the Registration Statement and the Prospectus when defendants had no intention for control of NBA to be shared or for Coulter to succeed McColl as Chairman and CEO of NBA, and that the Insider Defendants violated Section 15 of the Securities Act by controlling NB, a primary violator of the Act. Compl. at 45-49. Defendants object that the term "merger of equals" is too vague to be actionable and that the proxy fully disclosed the post-merger control arrangements. Further, defendants never guaranteed that Coulter would succeed McColl. Mem. Supp. Defs.' Mot. Dismiss at 18-19.
To establish a violation of Sections 11 and 12(a)(2), plaintiffs need only prove that they bought the security and that there was a material misstatement or omission in the registration statement or prospectus. NationsMart, 130 F.3d at 315, 318. Allegations of fraud or scienter are not required to establish liability under these Sections. Id.; Herman & MacLean, 459 U.S. at 382, 103 S.Ct. 683; Kaplan, 49 F.3d at 1371.
Defendants argue that the term "merger of equals" is too vague to be actionable. However, the Proxy/Prospectus and the Registration Statement essentially define "merger of equals" as shared control of the corporation such that no change of control premium would be paid to either sides' *1000 shareholders. Plaintiffs are alleging that, contrary to defendants' representations, defendants never intended for the merger to be a merger of equals such that control over the combined entity was shared. Further, they allege that Coulter's ouster was predetermined by McColl even before the merger was completed and was not merely a result of the public release of the information concerning Shaw. These allegations, if true, are material because there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Parnes, 122 F.3d at 546; Schoenhaut, 986 F.Supp. at 790; Zucker, 891 F.Supp. at 1014. That is, if the BA Holders had known that defendants never intended for control to be shared and for Coulter to succeed McColl, they would likely not have voted for the merger without the addition of a control premium. Consequently, this information was not so vague as to be immaterial.
Though plaintiffs rely mainly on anonymous quotes in The Wall Street Journal to establish that defendants never intended for the merger to be a merger of equals, this is sufficient to establish a violation of Sections 11 and 12(a)(2). The strict pleading requirements of the PSLRA and Rule 9(b) do not apply to claims pursuant to these Sections. Accordingly, plaintiffs have adequately alleged that defendants never intended the merger to be a merger of equals as that term is defined in the Proxy/Prospectus and Registration Statement.
However, plaintiffs have not established that the Registration Defendants, many of whom are merely directors of NB, OBA, and/or NBA, knew or could have discovered that the merger of equals statement was false when made. Keegan Management, 794 F.Supp. at 946. If plaintiffs can allege facts showing that individual directors were involved in the day-to-day affairs of the corporation such that they knew or were able to discover that the statement was false when made, then their Sections 11 and 12(a)(2) claims can be reinstated. Consequently, Counts VI and VII are dismissed as to all non-officer directors who are also Registration Defendants with leave to replead.
Additionally as with Counts II and V, plaintiffs have not sufficiently pled all the requirements to establish control person liability. Plaintiffs assert this claim against all Insider Defendants, including Higgins, Coulter, and O'Neill. These men were never officers of NB. Plaintiffs assert that the Insider Defendants controlled NB, a primary violator of the Act. However, plaintiffs have not established that Higgins, Coulter, and O'Neill had any control over NB at any time. Consequently, the Court dismisses Count VIII as to these three with leave to replead.[14]

F. Holder Classes' State Law Claims (Counts III and XII)

The NB Holder plaintiffs allege that the Registration Defendants breached their fiduciary duty to disclose under state law by failing to disclose the magnitude of the Shaw investment and the losses related thereto. Compl. at 42. The BA Holder plaintiffs allege that the OBA Director Defendants breached their fiduciary duty to disclose under state law by failing to disclose the magnitude of the Shaw investment and the losses related thereto. Id. at 51-52. Defendants object that Delaware law, applicable to the BA Holders' claim, precludes the assessment of damages for breach of a duty of disclosure if the corporation has an exculpatory charter provision adopted pursuant to 8 Del. C. § 102(b)(7) unless the director is shown to have acted in bad faith. Plaintiffs have allegedly failed to adequately plead bad faith on the part of the directors. Further, only material omissions are actionable *1001 under Delaware law, and none of the alleged omissions were material. Finally, the defendants argue that North Carolina law, applicable to the NB Holders' claim, has a similar statutory exculpatory provision, and if North Carolina were to follow Delaware law, plaintiffs could only recover if the directors acted in bad faith. Because there has been no showing of bad faith here, the defendants argue that the claim should be dismissed. Mem. Supp. Defs.' Mot. Dismiss at 23-24.
Because this Court found that plaintiffs adequately pled that the Insider Defendants knew of the Shaw losses as early as August 1998 but affirmatively failed to disclose them, supra Part III.A., and that those defendants knew that the merger was never intended to be a merger of equals but stated otherwise in the Prospectus and Registration Statement, both of which were material pieces of information, plaintiffs have adequately pled that the Insider Defendants who are also Registration or OBA Director Defendants acted in bad faith. The plaintiffs, however, have not adequately pled that the non-officer directors knew of the alleged omissions and false statements. Consequently, they have not adequately pled bad faith as to these defendants. If the plaintiffs can plead that individual directors had significant involvement in the day-to-day affairs of the company such that they can be presumed under the group pleading doctrine to know of the information, their state law claims can be reinstated. Accordingly, the Court dismisses Counts III and XII as to non-officer director defendants with leave to replead.

IV. CONCLUSION

For the foregoing reasons,
IT IS HEREBY ORDERED that defendants' motion to dismiss is granted in part and denied in part. Specifically,
IT IS HEREBY ORDERED that Count I is sufficient to state a claim for violation of Section 14(a) and Rule 14a-5. Defendants' motion to dismiss is denied with respect to this Count.
IT IS FURTHER ORDERED that Count II is dismissed for failure to state a claim with respect to defendants Higgins, Coulter, and O'Neill with leave to replead. However, Count II is sufficient to state a claim for violation of Section 20(a) against all other Insider Defendants, and defendants' motion to dismiss is denied with respect to these defendants.
IT IS FURTHER ORDERED that Count III is dismissed for failure to state a claim with respect to all non-officer director defendants with leave to replead. However, Count III is sufficient to state a claim for violation of state law against all other Registration Defendants, and defendants' motion to dismiss is denied with respect to these defendants.
IT IS FURTHER ORDERED that Count IV is sufficient to state a claim for violation of Section 10(b) and Rule 10b-5. Defendants' motion to dismiss is denied with respect to this Count.
IT IS FURTHER ORDERED that Count V is dismissed for failure to state a claim with respect to defendants Higgins, Coulter, and O'Neill with leave to replead. However, Count V is sufficient to state a claim for violation of Section 20(a) against all other Insider Defendants, and defendants' motion to dismiss is denied with respect to these defendants.
IT IS FURTHER ORDERED that Counts VI and VII are dismissed for failure to state a claim with respect to all non-officer director defendants with leave to replead. However, Counts VI and VII are sufficient to state a claim for violation of Sections 11 and 12(a)(2) against all other Registration Defendants, NBA, and the Insider Defendants, and defendants' motion to dismiss is denied with respect to these defendants.
IT IS FURTHER ORDERED that Count VIII is dismissed for failure to state a claim with respect to defendants Higgins, Coulter, and O'Neill with leave to replead. However, Count VIII is sufficient to state a claim for violation of Section *1002 15 against all other Insider Defendants, and defendants' motion to dismiss is denied with respect to these defendants.
IT IS FURTHER ORDERED that Counts IX and X are dismissed with prejudice for failure to state a claim for violation of Section 14(a) and Rule 14a-9.
IT IS FURTHER ORDERED that Count XII[15] is dismissed for failure to state a claim with respect to all non-officer director defendants with leave to replead. However, Count XII is sufficient to state a claim for violation of state law against all other OBA Director Defendants, and defendants' motion to dismiss is denied with respect to these defendants.
IT IS FURTHER ORDERED that Counts XIII and XIV are sufficient to state a claim for violation of Sections 10(b) and 20(a) and Rule 10b-5. Defendants' motion to dismiss is denied with respect to these Counts.

EXHIBIT A

GROUPS OF DEFENDANTS
Insider Defendants

McColl - CEO of New BankAmerica (NBA) and NationsBank
 (NB)
Hance - CFO of NBA and NB
Coulter - CEO of OBA and President (for a short time) of NBA
O'Neill - CFO of OBA, a President within NBA
Higgins - CAO of OBA
Oken - CAO of NB, a Vice President within NBA
Registration Statement Defendants
McColl - officer of NB and Fulton - director of NB
 NBA and NBA
Hance - officer of NB and Holman - director of NB
 NBA and NBA
Oken - officer of NB and Johnson - director of NB
 NBA and NBA
Rice - director of NB Lewis - director of NB
Anderson - director of NB Meyer - director of NB
Bornstein - director of NB Priority - director of NB
Bridgewater- director of NB Slane - director of NB
Capps - director of NB Sloan - director of NB &
 NBA
Carpenter - director of NB Spangler - director of NB &
 NBA
Coker - director of NB Suter - director of NB
 and NBA
Cousins - director of NB Townsend - director of NB &
 NBA
Craig - director of NB Ward - director of NB &
 NBA
Dickson - director of NB J. Williams- director of NB
 and NBA
 V. Williams- director of NB &
 NBA
Old BankAmerica (OBA) Director Defendants
Coulter - officer of OBA Hope - director of OBA
 and NBA
Alibrandi - director of OBA Massey - director of OBA
 and NBA
Bedford - director of OBA Robertson - director of OBA
Clarke - director of OBA Rosenberg - director of OBA
 and NBA
Crull - director of OBA Spence - director of OBA
 and NBA and NBA
Feldstein - director of OBA Trujillo - director of OBA
 and NBA and NBA
Guinn - director of OBA Young - director of OBA
 and NBA and NBA

NOTES
[1] NationsBank was a North Carolina corporation until September 25, 1998, when it reincorporated in Delaware. Mem. Supp. Defs.' Mot. Dismiss at 3 (Doc. 44).
[2] Leverage is "the use of credit or borrowed funds [to buy securities] in order to improve one's speculative ability and to increase an investment's rate of return." Black's Law Dictionary 918-19 (7th ed.1999).
[3] Defendants fail to address the specifics of the OBA-Shaw relationship. Because the Court must examine the complaint in the light most favorable to plaintiffs, the Court will accept these facts as true for purposes of this motion.
[4] Many hedge funds also speculate on the relationships between foreign and U.S. currency. Roger Lowenstein, Not Reckless Enough: Forget Long-Term Capital. Here's the Real Problem with Hedge Funds, Smart Money, Dec. 1998, at 77. It is not clear from plaintiffs' complaint if D.E. Shaw's investment strategy also included such practices. Further, the riskier hedge funds are highly indebted, borrowing well over 100 percent of their capital. Id. (discussing Long-Term Capital Management which borrowed 60 times its capital). Shaw apparently had borrowed some 20 times its capital. Compl. at 23 (discussing how Shaw leveraged its $1.4 billion in capital to support a $20 billion bond portfolio).
[5] The counts are numbered from 1 to 14, but Count XI was omitted.
[6] Defendants urge this Court to reject NationsMart in light of the subsequent passage of the PSLRA. Because the PSLRA does not change the substantive elements required by §§ 11 and 12(a)(2) and because NationsMart is binding precedent in this District, the Court rejects defendants argument and will not apply Rule 9(b) to the § 11 and § 12(a)(2) claims.
[7] The North Carolina Business Corporation Act, which would apply to the NationsBank Holders' state law claim, apparently contains a similar provision to 8 Del. C. § 102(b)(7). However, defendants admit that North Carolina state courts have not yet interpreted this statute in the same way as the courts in Delaware have. For the purposes of this motion, the Court will apply the Delaware standard to the NB Holders' claim.
[8] Plaintiffs could solve this problem by pleading as they did in Count XIV, that the entity controlled was NBA or its predecessors.
[9] The fact that the $1.4 billion loan to Shaw was small in comparison to the assets of the two banks does not make the Shaw information immaterial per se. Rather, the question is whether the omitted information would be viewed by the reasonable investor as altering the total mix of information available. The fact that the $1.4 billion loan was leveraged up to 20 times that amount and was used to make risky bond trades would certainly be viewed by the reasonable investor as altering the total mix of information about the health and future prospects of the banks.
[10] Defendants also assert that the safe harbor and bespeaks caution doctrines apply because the omissions were forward-looking projections and were accompanied by sufficient cautionary statements. The Court has already found that the statements were not forward-looking projections but were pre-existing hard facts. Accordingly, the safe harbor provision does not apply. Additionally, defendants' boilerplate warnings as to the risk of market volatility are not sufficient to alert the market to the existence of a large relationship with a highly-leveraged hedge fund that was experiencing losses due to its risky trading practices. Accordingly, the bespeaks caution doctrine also does not apply.
[11] As stated earlier, plaintiffs could solve this problem by pleading as they did in Count XIV, that the entity controlled was NBA or its predecessors.
[12] See footnote 9, supra (discussing materiality of loan despite its small size in comparison to bank's total assets).
[13] See footnote 10, supra (discussing inapplicability of bespeaks caution and safe harbor doctrines to this case).
[14] Plaintiffs could solve this problem by pleading as they did in Count XIV, that the entity controlled was NBA or its predecessors.
[15] Plaintiffs omitted Count XI.